[Cite as *State v. McComb*, 2022-Ohio-1423.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29111 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-3663 |
| | : | |
| DAMITREE MCCOMB | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 29th day of April, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JEFFREY T. GRAMZA, Atty. Reg. No. 0053392, 101 Southmoor Circle NW, Kettering, Ohio 45429
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

EPLEY, J.

**{¶ 1}** Defendant-Appellant Damitree McComb was convicted after a jury trial in the Montgomery County Court of Common Pleas of two counts of felonious assault, 14 counts of violating a protection order, and one count of intimidation of a victim. McComb appeals, claiming that his convictions for felonious assault were based on insufficient evidence and against the manifest weight of the evidence. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

**{¶ 2}** McComb and Yountay Pullen were in a romantic relationship, intermittently, for seven years. By September 2020, though, the relationship had deteriorated appreciably. Pullen sought and received a domestic violence civil protection order (DVCPO) against McComb. She told McComb about the order, which angered him. He was not immediately served with the order, and McComb continued to contact Pullen; the two had frequent arguments.

**{¶ 3}** At approximately 9:15 a.m. on November 19, 2020, Pullen drove with her eight-year-old son to the Kroger gas station at the corner of West Siebenthaler and Klepinger Avenues in Dayton. While stopped at a pump, Pullen saw McComb's vehicle at the intersection, and she left the Kroger to avoid him. McComb saw her and chased after her in his vehicle. As Pullen sped along Siebenthaler, McComb caught up to her and rammed the back of her SUV with his Trailblazer, causing Pullen to swerve into oncoming traffic. When Pullen stopped at a tire store at the intersection of West

Siebenthaler Avenue and North Main Street, McComb got out of his vehicle, went over to Pullen's SUV, and kicked the side of it. He left before the police arrived.

{¶ 4} On December 1, 2020, McComb was indicted on two counts of felonious assault with a deadly weapon (motor vehicle), felonies of the second degree. One charge identified the victim as Pullen, and the other identified the victim as her son. The police arrested McComb on December 3, 2020, and he was served with the DVCPO the next day.

{¶ 5} Following his arrest, McComb contacted Pullen 308 times from the Montgomery County Jail. In some calls, McComb attempted to dissuade Pullen from coming to court and pursuing the charges against him. On February 19, 2021, a grand jury indicted McComb on 15 additional charges: 14 counts of violating a protection order, all felonies of the fifth degree (because McComb had a prior conviction for violating a protection order), and one count of intimidation of a victim, a felony of the third degree.

{¶ 6} The matter proceeded to a jury trial, at the conclusion of which the jury found McComb guilty of all charges. At sentencing, the trial court imposed an aggregate term of a minimum of seven years and a maximum of nine and a half years in prison. McComb appeals from his convictions, raising one assignment of error.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 7} In his sole assignment of error, McComb claims that his convictions for felonious assault were based on insufficient evidence and were against the manifest weight of the evidence.

### A. Relevant Legal Standards

**{¶ 8}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

**{¶ 9}** In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 10}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of

particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 11} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *Thompkins* at 386. However, where an appellate court determines that a conviction is not against the manifest weight of the evidence, the conviction is necessarily based on legally sufficient evidence. *State v. McLoughlin*, 2d Dist. Champaign No. 2017-CA-22, 2018-Ohio-2426, ¶ 8; *State v. Million*, 2d Dist. Montgomery No. 24744, 2012-Ohio-1774, ¶ 23.

{¶ 12} In this case, McComb was charged with two counts of felonious assault in violation of R.C. 2903.11(A)(2). That statute provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). A deadly weapon is "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2903.11(E)(1); R.C. 2923.11(A). A motor vehicle can constitute a deadly weapon. *See, e.g.*, R.C. 2903.11(D)(4); *State v. Morrow*, 2d Dist. Clark No. 2002-CA-37, 2002-Ohio-6527. "A careless or negligent use of a vehicle, however, does not equal use of the vehicle as a deadly weapon without evidence that the driver actually used or possessed the vehicle as a weapon as opposed to a conveyance." *State v. Nastal*, 6th Dist. Wood No. WD-21-

042, 2022-Ohio-970, ¶ 20.

{¶ 13} "A person acts knowingly, regardless of his [or her] purpose, when he [or she] is aware that his [or her] conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he [or she] is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 14} "Culpable mental states are frequently demonstrated through circumstantial evidence." *State v. Hypes*, 2d Dist. Clark No. 2018-CA-110, 2019-Ohio-4096, ¶ 21, quoting *State v. Fox*, 2018-Ohio-501, 106 N.E.3d 224, ¶ 14 (10th Dist.). Circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 482 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 49. In some cases, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991). A defendant's state of mind may be inferred from the totality of the circumstances. *State v. Murphy*, 2d Dist. Montgomery No. 27802, 2018-Ohio-3506, ¶ 16.

**B. Evidence Presented at Trial**

{¶ 15} At trial, the State presented the testimony of Pullen, Ronnye Gilkey (Pullen's sister), and three law enforcement officers, and it introduced several exhibits. Because McComb has not challenged his convictions for violating a protection order or intimidation of a victim, we focus on the evidence related to the felonious assault charges.

{¶ 16} According to Pullen, she and McComb dated on and off for seven years and were together for the year preceding November 19, 2020. She described their

relationship during their last year as "toxic." On September 21, 2020, Pullen petitioned for a DVCPO, which was granted after an ex parte hearing. Pullen stated that she sought the protection order because when she did not want to be with McComb, he would "pop up, threatening," and she was afraid of him. Pullen informed McComb about the DVCPO, and he was "mad."

{¶ 17} In November 2020, Pullen's sister, Gilkey, took care of Pullen's minor children while Pullen worked an overnight shift. On the morning of November 19, 2020, Pullen drove to her sister's Centerville home in her 2012 black Ford Explorer to pick up her children. As Pullen started to drive off, Gilkey ran out of her home to provide a folder that one of the children had left behind. Gilkey testified that she went around Pullen's vehicle, and the SUV had no visible damage to the trunk area. Pullen also testified that her SUV was not damaged at that time.

{¶ 18} Pullen made a brief stop at her mother's home to drop off her daughters there. Gilkey testified that she had another opportunity to view Pullen's SUV at their mother's home. At that time, Gilkey still did not see any damage to Pullen's SUV. Soon after, Pullen left with her eight-year-old son, T.P, in the back seat.

{¶ 19} At 9:17 a.m., Pullen stopped at the Kroger at the corner of Klepinger and West Sieberthaler Avenues to buy gas. When she got to the gas station, she saw McComb in his burgundy Trailblazer stopped at the light on Klepinger Avenue. Pullen left the gas station without buying fuel in the hopes that McComb would not see her. Pullen stated that she wanted to avoid McComb, because he had tried to contact her several times that morning; Pullen had answered the phone once and knew they would

"be feuding." Surveillance video from the Kroger showed McComb's arrival and departure without buying gas. It also showed McComb quickly driving through the Kroger parking lot to follow Pullen. (State's Ex. 6.)

{¶ 20} Pullen testified that McComb drove around cars to catch up with her. She estimated that she was driving at least 65-70 mph on Siebenthaler (the posted speed limit was 35 mph), but McComb gained on her. When McComb caught up, he "rammed" her SUV and "kept hitting it." The contact caused her swerve into oncoming traffic, and a small green car had to move out of the way to avoid a collision. Rather than braking, Pullen tried to speed up. When Pullen reached the intersection with North Main Street, she pulled into the tire shop and asked two women there to call the police. (Pullen's phone had fallen from the seat beside her and was temporarily inaccessible.)

{¶ 21} According to Pullen, McComb stopped in the roadway, got out of his vehicle, came over to her SUV in the tire shop parking lot, and started kicking the back driver's side of her vehicle. McComb then returned to his car and headed toward downtown Dayton on North Main Street. Pullen called the police on her cell phone and began to follow McComb so she could tell the police where he was heading. When Pullen lost sight of McComb, she returned to the tire store to wait for law enforcement to arrive.

{¶ 22} At 10:20 a.m., Dayton Police Officer Cayce Cantrell went to 1901 North Main Street, the tire store located at the corner of Main Street and Siebenthaler Avenue, on a report of a domestic disturbance. When the officer arrived, she made contact with Pullen, who was there with her 8-year-old son. Cantrell noticed that Pullen was "visibly shaken, scared, frightened, [and] upset." Pullen told the officer what had occurred. At

trial, the officer recounted what Pullen had said, which was consistent with Pullen's testimony at trial. Officer Cantrell described Siebenthaler Avenue as a two-lane "very high-traffic" area.

{¶ 23} Officer Cantrell observed and took photographs of Pullen's vehicle. She saw "damage to the back hatch of the car where it was dented as well as the driver's side rear quarter panel was dented along with a visible footprint mark." (Trial Tr. 60.) The State introduced Cantrell's photographs of the vehicle. According to Cantrell, Exhibit 1A showed that "the whole left side [of the trunk] was concaved in." Exhibit 1B showed the dent in the driver's side rear quarter panel and the footprint. Pullen also identified the damage to the bumper and driver's side of her car and testified that McComb had caused the damage.

{¶ 24} Officer Cantrell testified that two witnesses were present at the tire center. She spoke with both witnesses, and their statements were consistent with Pullen's information. The officer also investigated whether there were any tire marks or other indications that a vehicle had swerved on Siebenthaler, but she did not see anything.

{¶ 25} During her testimony, Pullen stated that McComb again chased her with his vehicle on November 22, 2020, three days after the incident. This time, Pullen was involved in a collision with another vehicle, and she went to the hospital due to shoulder pain.

{¶ 26} Detective Daniel O'Neill conducted a follow-up investigation of the November 19 incident. He spoke with Pullen, who provided a statement similar to her trial testimony. O'Neill also looked at Pullen's SUV and observed a two-by-two foot large

dent in the rear gate, damage to the rear bumper, and damage to the left rear. (*See* State's Exs. 17A-E.) The detective located McComb's vehicle and saw damage to the fog lamps on the front bumper. (State's Exs. 12.) He noted that two circles that he found on Pullen's rear bumper appeared to match up with the front bumper of McComb's vehicle.

{¶ 27} McComb made numerous phone calls to Pullen following the November 19 encounter and left SnapChat messages on Pullen's phone. In one SnapChat message, McComb said he was going to "dog her" and would hurt her when he caught her. In another message, McComb stated, "I want to catch you on the highway because I'm going to spin that bitch all the way out." (State's Ex. 11; *see* Trial Tr. 184.) Pullen also testified that between November 19 and December 3, 2020, she spoke with McComb several times and had asked him why he had done it, particularly with her child in the car. McComb responded to her that he had not known her son was in the SUV.

{¶ 28} McComb was arrested on December 3, 2020. According to Captain Brad Daugherty of the Montgomery County Sheriff's Office, 308 telephone calls were made from the Montgomery County Jail to two cell phone numbers – which Pullen identified as hers – between December 3, 2020 and February 18, 2021. (*See* State's Ex. 2.) All but two of the calls were made from McComb's account; the other two were made from the account of another inmate who was housed in the same location in the jail as McComb. McComb repeatedly threatened Pullen or attempted to dissuade her from pursuing the charges.

{¶ 29} Testifying in his own defense, McComb stated that he and Pullen had been

separated for a few days when the Siebenthaler incident occurred. He indicated that he had been upset and frustrated that he could not talk with her, and he had wanted to talk with her face-to-face about the situation. McComb admitted that he had followed her in his vehicle, but he denied hitting her with his car, even accidentally, or trying to scare or hurt her. McComb explained that he had just wanted to talk with Pullen, and his plan was to follow her until she stopped. McComb stated that he was driving two car-lengths behind her, and he asserted that Pullen's speeding and erratic driving "was on her" and not his fault.

{¶ 30} McComb admitted that he kicked Pullen's car at the tire shop and said that he did so because of the irresponsible way she had been driving. He acknowledged that he had not talked with Pullen there. McComb further testified that he had not been aware that T.P. was in the car with Pullen until after he had kicked Pullen's vehicle, but he admitted on cross-examination that he had known there was "75 percent of the chances" that T.P. would be there.

{¶ 31} McComb testified that when he was arrested after the incident, he was again staying with Pullen, and he claimed that they had been in bed together when the police arrived. McComb described his relationship with Pullen as up and down and unhealthy, with each accusing the other of cheating, and he said that he had never "put his hands on" Pullen. He indicated that he was aware that his jail phone calls had been recorded, and he asserted that he never would have made them if he had known a protection order was in place; McComb stated that he believed the DVCPO that he had received on December 4, 2020 had expired. He denied trying to threaten or intimidate

Pullen during the phone calls and explained that he had made statements out of anger and had not meant them.

{¶ 32} On appeal, McComb argues that Pullen was the only person who witnessed the alleged ramming of her SUV with his Trailblazer, and thus the State failed to prove that a collision occurred. He further asserts that, even if the collision were proven, the State failed to establish that he knowingly attempted to cause her physical harm. McComb emphasizes that merely following Pullen's car did not "create a risk of serious physical harm" and that she could not know "with any level of certainty" what his intent had been that day. McComb states that the alleged contact between the vehicles could have been completely accidental and that the jury lost its way when it determined that McComb had had an intent to harm or cause a significant risk of harm to Pullen.

{¶ 33} At the outset, the State was not required to prove that McComb "intentionally" or "recklessly" attempted to cause "serious physical harm" to Pullen and her son. The felonious assault statute requires the defendant to act knowingly, not purposefully (with a specific intent) or recklessly. In addition, under R.C. 2903.11(A)(2) (the deadly weapon provision), the defendant need only cause or attempt to cause "physical harm," not "serious physical harm," to another. Upon review of the evidence as a whole, the State presented substantial evidence that McComb knowingly attempted to cause physical harm to Pullen and T.P. when he hit Pullen's SUV with his own vehicle.

{¶ 34} First, there was substantial evidence that a collision occurred. Pullen testified that McComb had chased after her vehicle on Siebenthaler at a high rate of speed (at least in excess of 70 mph), passing other cars to catch up, and then rammed the back

of her SUV with his vehicle, causing her to swerve into oncoming traffic. While McComb argues that no one witnessed the collision, Pullen's testimony, if believed, was sufficient to prove that McComb had hit Pullen's SUV with his own vehicle. *See State v. Page*, 2d Dist. Montgomery No. 26670, 2017-Ohio-568, ¶ 30 (victim's testimony, if believed, was sufficient to prove offense); *State v. Burns*, 2d Dist. Montgomery No. 24174, 2012-Ohio-2536, ¶ 32.

{¶ 35} Moreover, the State presented substantial circumstantial evidence to corroborate Pullen's testimony regarding McComb's conduct. Surveillance video from the Kroger showed McComb racing through the Kroger parking lot after Pullen left the fuel center. Gilkey's testimony supported Pullen's statements that her vehicle had not bbeen damaged prior to the Siebenthaler encounter with McComb on November 19, 2020. Officer Cantrell's testimony, as well as her photographs of Pullen's vehicle, substantiated that the trunk area as well as the driver's side of Pullen's SUV had been damaged. Detective O'Neill also observed damage to the rear of Pullen's SUV when he saw it several days later, as well as damage to the front of McComb's vehicle, which appeared to match up. The State did not present witnesses from the tire store, but Office Cantrell further testified that two witnesses provided statements which supported Pullen's recounting of what had occurred there. The jury reasonably concluded that McComb had hit Pullen's vehicle with his own vehicle.

{¶ 36} The jury also reasonably concluded that McComb had knowingly attempted to cause physical harm to Pullen and T.P. Pullen described her tumultuous relationship with McComb and his anger when she avoided communication with him, as she had on

the morning of November 19, 2020. The manner and speed with which McComb caught up to Pullen on Siebenthaler reasonably demonstrated that McComb was not merely using his vehicle for transportation, but instead was using it to act aggressively toward Pullen. Pullen stated that she accelerated in response to the chase and the contact between the vehicles, and that McComb had to catch up with Pullen's SUV to hit her. McComb's decision to stop at the tire shop and kick Pullen's SUV further supported a conclusion that he had knowingly hit her SUV with his Trailblazer moments earlier. McComb also made statements following the incident that indicated that the contact between the vehicles was not accidental, and he engaged in similar conduct three days later, which further supported a conclusion that the collision was done knowingly and not accidentally.

{¶ 37} McComb testified that he had been unaware of T.P.'s presence when the Siebenthaler incident occurred, however the doctrine of transferred intent applied to protect T.P., an unintended victim of McComb's conduct, as well as Pullen, the intended victim. "The doctrine of transferred intent indicates that where an individual is attempting to harm one person and as a result accidentally harms another, the intent to harm the first person is transferred to the second person and the individual attempting harm is held criminally liable as if he both intended to harm and did harm the same person." *State v. Free*, 2d Dist. Montgomery No. 15901, 1998 WL 57373, *10 (Feb. 13, 1998), quoting *State v. Mullins*, 76 Ohio App.3d 633, 636, 602 N.E.2d 769 (10th Dist.1992).

{¶ 38} In short, based on the evidence at trial, the jury reasonably found McComb guilty of felonious assault with a deadly weapon (motor vehicle) as to both Pullen and

T.P. Although McComb denied chasing Pullen with his vehicle and colliding with her SUV, the jury was free to disbelieve his testimony and credit the State's version of events. McComb's convictions for felonious assault were neither based on insufficient evidence nor against the manifest weight of the evidence. Accordingly, his sole assignment of error is overruled.

### III. Conclusion

{¶ 39} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Jeffrey T. Gramza
Hon. Mary E. Montgomery