[Cite as *State v. Butler*, 2023-Ohio-3504.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29754 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 02014 |
| | : | |
| TERRANCE VONJUR BUTLER | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on September 29, 2023

. . . . . . . . . . .

CHIMA R. EKEH, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendant-Appellant Terrance Vonjur Butler appeals from his convictions in the Montgomery County Court of Common Pleas after he was found guilty following a bench trial of murder, felonious assaults, discharge of a firearm on or near a prohibited premises, having weapons while under disability, involuntary manslaughter, and

accompanying specifications. Butler was sentenced to an aggregate prison term of 27 years to life and ordered to pay restitution in the amount of $12,955. For the reasons that follow, the judgment of the trial court will be affirmed.

## I. Facts and Procedural History

{¶ 2} On June 15, 2021, Butler and Marquan Cooper both attended a family birthday party at the house of Marquan's sister, Chanea Printup. The two had known each other for years as Butler had dated and had a baby with another one of Marquan's sisters, Markesia Printup. Mizette Printup (Marquan, Chanea, and Markesia's sister) and her fiancé, Deja Hatfield, were also in attendance, as were Marquan's girlfriend, Tailyn Goodman, and their young son.

{¶ 3} At some point during the gathering, Butler and Marquan began arguing. Tensions got so high that, to diffuse the volatile situation, Markesia insisted that she, Butler, and their child leave the party. After initially refusing, Butler finally agreed to get in the car and go. In the car, however, Butler was still upset; he and Marquan continued to exchange calls and texts, including the following exchange:

Marquan:     I'll smoke you on my mama.

Butler:          Pull on up. Pull on up.

{¶ 4} Markesia drove Butler to the Taco Bell at Leo Street and Stanley Avenue to allow time for things to simmer down; she did not want to go home because she knew Marquan and Butler would fight. She told the court that after they parked, Butler pulled the keys out of the ignition and removed their house key from the key chain. He threw the car keys back to Markesia and took off on foot.

{¶ 5} At some point after leaving Markesia and their son in the parking lot, Butler met up with his nephew, Tevon. They drove to Butler's house on Notre Dame Avenue and parked on the street. Security camera footage showed that Butler got out of the car and went inside the house. He emerged a short time later carrying a gun that he then deposited in Tevon's car. Butler spent the next few minutes loitering in the street, waiting for Marquan to show up. When Marquan arrived a short time later, he parked his car in the middle of the street and charged at Butler. Mizette, Deja, and Tailyn, who were also in the car, exited to watch the fight.

{¶ 6} Surrounded by family and friends, Marquan and Butler fought up and down the street and, later, in the front yard. No one made an effort to break up the fight. After several minutes, Marquan decided it was over and returned to his car with Tailyn. As the car began to drive in reverse back up the street to leave, Mizette and Deja realized that they were being left behind and began running to catch up. Meanwhile, Butler returned to Tevon's car, retrieved his firearm, and, standing in the middle of the street, unloaded ten rounds in the direction of the fleeing car.

{¶ 7} Two of the bullets hit the windshield of the car carrying Marquan, Tailyn, and their child. One round hit Mizette in the back of the neck as she ran to catch up. She immediately fell to the ground. Tailyn testified that she heard Marquan scream "He shot my sister," before jumping out of the car to tend to Mizette. Butler left the scene in Tevon's light-colored Chrysler.

{¶ 8} First responders arrived within minutes. Mizette was in grave condition. Officer Joseph Sheen from the Dayton Police Department arrived first and found people

in the street crowded around Mizette. He told the court that the victim was non-responsive when he got there; she was barely breathing and had no pulse. Kayla Rike, a paramedic with the Dayton Fire Department, testified that when she arrived, officers were doing CPR on Mizette. She was immediately intubated and Rike began breathing for her. Rike confirmed that upon arrival at Miami Valley Hospital, Mizette had no pulse.

{¶ 9} Mizette never regained consciousness and succumbed to her injuries several days later. Dr. Susan Brown, a forensic pathologist at the Montgomery County Coroner's Office performed the autopsy. She testified that Mizette had an entrance wound on the back of her neck and that the bullet traveled through the soft tissue of the neck and into her spine. It then went through the left vertebral artery and came to rest on the left side of her neck. There was no exit wound. Dr. Brown told the court that injuring the vertebral artery (which supplies blood to the brain) would result in a stroke and that the spinal cord injury would have resulted in difficulty breathing. The cause of death was determined to be a gunshot wound to the neck.

{¶ 10} Detectives who arrived on the scene had been informed that the suspect, Butler, had fled in a light-colored Chrysler. The investigation eventually led detectives to believe that Butler was staying at an apartment at the Meadows of Catalpa complex in Dayton. He was arrested there without incident. As he was being led to a police cruiser, Butler asked Detective David House where Mizette was shot and if she was dead. A search of the apartment located a Glock model 32 .357 caliber firearm hidden in a shoebox. Further testing confirmed that the spent casings found at the scene had been fired from that weapon.

{¶ 11} Butler was ultimately charged with a total of 17 counts: two counts of murder, multiple counts of felonious assault, multiple counts of discharge of a firearm on or near prohibited premises, multiple counts of having weapons while under disability, and a single count of involuntary manslaughter. All the charges, except for having weapons while under disability, had corresponding three-year and 54-month firearm specifications attached. After two unsuccessful motions to suppress, Butler waived his right to a jury, and the case proceeded to a bench trial on February 13 and 14, 2023.

{¶ 12} At trial, the State presented testimony from various family members, first responders, law enforcement, and the forensic pathologist. The court also considered numerous exhibits, including autopsy photos and videos of the fight and shooting. Butler testified in his own defense. He presented the court with rap videos made by Mizette and Marquan which showed Marquan with a gun. About a week after the trial concluded, the court reconvened to announce its verdict of guilty on all counts and specifications.

{¶ 13} After addressing merger issues, the State elected to proceed on the "enhanced" firearm specifications. Butler was sentenced to an aggregate prison term of 27 years to life and ordered to pay nearly $13,000 in restitution. He filed a timely appeal asserting two assignments of error.

## II.     Self Defense

{¶ 14} In his first assignment of error, Butler contends that the trial court erred by finding that the State proved, beyond a reasonable doubt, that he did not use deadly force in self-defense.

{¶ 15} A person may act in self-defense, defense of another, or defense of that

person's home. R.C. 2901.05(B)(1). To warrant an instruction of self-defense, there must be evidence presented by the defendant that (1) he or she was not at fault in creating the violent situation, and (2) the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only way to escape was the use of force. *State v. Cunningham*, 2d Dist. Montgomery No. 29122, 2023-Ohio-157, ¶ 14; *State v. Lovett*, 2d Dist. Montgomery No. 29240, 2022-Ohio-1693, ¶ 41. If the defendant puts forth evidence that he or she acted in self-defense, the prosecution must prove beyond a reasonable doubt that the accused did not use force in self-defense. R.C. 2901.05(B)(1); *Lovett* at ¶ 40.

{¶ 16} When self-defense is raised, different standards apply depending on whether the defendant responded with deadly or non-deadly force. *State v. Rothermel*, 2d Dist. Montgomery No. 26004, 2014-Ohio-3168, ¶ 12, citing *State v. New*, 10th Dist. Franklin No. 92AP-04, 1994 WL 521253, *2 (Sept. 20, 1994). "Deadly force" is defined as "any force that carries a substantial risk that it will proximately result in the death of any person." R.C. 2901.01(A)(2). The use of a gun constitutes deadly force. *State v. Dale*, 2d Dist. Champaign No. 2012-CA-20, 2013-Ohio-2229, ¶ 15; *State v. Barker*, 2022-Ohio-3756, 199 N.E.3d 626, ¶ 21 (2d Dist.).

{¶ 17} The State's burden of disproving a defendant's self-defense claim beyond a reasonable doubt is subject to manifest weight review on appeal. *State v. Messenger*, Ohio Slip Opinion No. 2022-Ohio-4562, __N.E.3d. __, ¶ 27. This is the proper analysis because the defendant claiming self-defense does not seek to negate an element of the crime, but rather to relieve himself from culpability. *State v. Lanier*, 8th Dist. Cuyahoga

No. 110826, 2022-Ohio-240, ¶ 16.

{¶ 18} In this case, the State proved Butler did not act in self-defense.

{¶ 19} Butler and Marquan began arguing at the family get-together, and the argument continued even after Butler and Markesia left the party. Texts and calls were exchanged between the men that seemed to show that Marquan threatened Butler ("I'll smoke you on my mama.") and that Butler, in response, invited Marquan to engage in a physical altercation ("Pull on up. Pull on up."). Butler's intention to fight Marquan was further demonstrated by his actions at Taco Bell. Markesia drove the couple to Taco Bell to calm Butler down, but he was so determined to get home to meet up with Marquan that he pulled the house keys off of Markesia's keychain and took off on foot, eventually catching a ride home with his nephew, Tevon. Butler's actions to facilitate a fight with Marquan were contrary to his self-defense claim, as "[i]t is well established that a person cannot provoke a fight or voluntarily enter combat and then claim self-defense." *State v. James*, 2d Dist. Montgomery No. 28892, 2021-Ohio-1112, ¶ 21, citing *State v. Wallace-Lee*, 2d Dist. Greene No. 2019-CA-19, 2020-Ohio-3681, ¶ 39.

{¶ 20} Nevertheless, Butler argues that Marquan was the aggressor in the altercation, noting that Marquan had pulled up in his car and immediately jumped out and charged at him. And while that account was borne out by the video footage presented as exhibits, it was equally true that Butler had been out in the street waiting for Marquan's arrival. The videos showed him posturing and "limbering up," demonstrating that Butler was a willing combatant when Marquan got there. Butler was at least partially to blame for creating the violent situation.

{¶ 21} Even if Butler could establish the first element of self-defense, the State proved that he did not meet the second prong: a bona fide belief that he was in imminent danger of death or great bodily harm and that the only way to escape was the use of deadly force.

{¶ 22} In support of this element, Butler asserts that he was fearful that Marquan was going to kill him, i.e., he was scared for his life. Butler testified that Marquan had had a gun at the party, and after the fight on Notre Dame Avenue began, Marquan stated, "Bitch, I'm a kill you." Trial Tr. at 363. Butler further told the court:

> I was scared for my life. I felt like Marquan was going to kill me, because he told me out his own mouth that he was going to kill me. And he told me through text that he'd smoke me on his mama. And when he went to his car, I panicked. * * * It was a cluster of emotions going on and I just reacted.

Trial Tr. at 365. This testimony, though, was at odds with other evidence presented at trial. As to the contention that Marquan had a gun, Butler was the only person to attest to that. In fact, both Markesia and Tailyn testified that Marquan had been unarmed, and on cross-examination, Butler admitted that Marquan had not had a gun during the fight. Trial Tr. at 390.

{¶ 23} Further, Butler's contention that he was afraid for his life was belied by his actions prior to the fight. It was undisputed that Marquan sent a text message threatening to "smoke" (shoot) Butler. However, Butler's actions after getting that text gave the impression that he was not afraid. He replied to the threatening message with a text inviting Marquan to "pull on up" – essentially, an invitation to come over and fight. That

was not the response of someone who was afraid.

**{¶ 24}** Butler also thwarted his girlfriend's attempt to keep him away from Marquan by stealing her house key and getting a ride with Tevon to the fight. After arriving home several minutes before Marquan, Butler could have simply gone inside the house and stayed there. Instead, he waited out in the street to get ready for Marquan's appearance, and when the car pulled up, his actions and posturing made it clear he was ready to fight.

**{¶ 25}** The biggest weakness in Butler's self-defense claim, though, was his activity after the conflict concluded. As Marquan's car was leaving – backing up down the street – Butler walked across his front yard, out into the street, and retrieved his gun from Tevon's car. He then walked toward the fleeing vehicle (and the people running to catch up with it) and fired. He did not just shoot one or two "warning shots" into the air to scare Marquan away as he argued at trial; instead he shot ten rounds at the car. Two hit the vehicle and one killed Mizette. There is no plausible argument that Butler was acting in self-defense when, 35 seconds after the fight ended, he fired at Marquan as he was traveling in the opposite direction and then hit Mizette in the back of the neck as she was running away.

**{¶ 26}** Based on the evidence presented at trial, we cannot conclude that the trial court erred by finding the State proved beyond a reasonable doubt that Butler did not act in self-defense. The first assignment of error is overruled.

### III.     Sufficiency of the Evidence

**{¶ 27}** In his second assignment of error, Butler argues that his convictions for felonious assault on Deja Hatfield and Mizette Printup were not supported by sufficient

evidence. We disagree.

{¶ 28} "[S]ufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). It is essentially a test of adequacy: whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.*

{¶ 29} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 2010-Ohio-5160, 946 N.E.2d 762, ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*. A conviction based on legally insufficient evidence constitutes a denial of due process and will bar a retrial. *Thompkins* at 386-387.

{¶ 30} A person is guilty of felonious assault if he or she knowingly (1) causes serious physical harm to another or another's unborn, or (2) causes or attempts to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordinance. R.C. 2903.11(A)(1)-(2). On appeal, Butler's argument seems to be that he should not have been found guilty of felonious assault because he had been aiming for Marquan and therefore had not knowingly fired at Deja and Mizette or

knowingly caused serious physical harm to Mizette. This argument fails under the weight of the transferred intent doctrine.

{¶ 31} "The doctrine of transferred intent indicates that where an individual is attempting to harm one person and as a result accidentally harms another, the intent to harm the first person is transferred to the second person and the individual attempting harm is held criminally liable as if he both intended to harm and did harm the same person." *State v. McComb*, 2d Dist. Montgomery No. 29111, 2022-Ohio-1423, ¶ 37, quoting *State v. Free*, 2d Dist. Montgomery No. 15901, 1998 WL 57373, *10 (Feb. 13, 1998) (applying transferred intent to felonious assault and holding that it applies to crimes requiring a mens rea of knowingly).

{¶ 32} Here, there is no doubt that Butler knowingly shot at Marquan but hit Mizette instead. He testified that, "I wasn't aiming at nobody in particular but 'Quanny.' I aimed in his direction and unfortunately Mizette got shot and the car got shot." Trial Tr. at 381. His intent to shoot Marquan was transferred to Mizette. Even Butler's trial attorney agreed: "As [it] relates to the death of Mizette, I think transferred intent applies." Trial Tr. at 412. She suffered serious physical harm when Butler knowingly fired at Marquan. The felonious assault conviction as it relates to Mizette was supported by sufficient evidence.

{¶ 33} The felonious assault charge related to Deja fell under R.C. 2903.11(A)(2) (causes or attempts to cause physical harm to another by means of a deadly weapon) because she was not struck by a bullet. Butler asserts that his intent to shoot Marquan should not attach to Deja because she was not in the line of fire when he shot at Marquan. He claims that this case is similar to *State v. Mills*, 62 Ohio St.3d 357, 582 N.E.2d 972

(1992), in which the Ohio Supreme Court vacated a felonious assault conviction. The *Mills* Court reasoned that there was insufficient evidence to support felonious assault because the victim was "not in the line of fire when the gunman entered and [then she] hid underneath her desk during the remainder of the robbery"; therefore the State could not show a knowing attempt to cause physical harm. *Id.* at 369. The case at bar presented a much different story. Security footage (Exhibit 12B) showed Marquan's car driving in reverse up the street with Deja and Mizette running side-by-side trying to catch up. According to the video, the two women were no more than a few feet apart when Butler began to shoot in their direction and when Mizette was struck in the back of the neck. Mizette was clearly in the line of fire, and Deja's close proximity to Mizette supported the conclusion that she was too. The doctrine of transferred intent applied here as well.

{¶ 34} Butler's convictions for felonious assault against Mizette and Deja were based on sufficient evidence. The second assignment of error is overruled.

## IV. Conclusion

{¶ 35} The judgment of the trial court will be affirmed.

. . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.