[Cite as *State v. Baker*, 2024-Ohio-2550.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Appellee | : | C.A. No. 2023-CA-28 |
| v. | : | Trial Court Case No. 23-CR-0071 |
| DEAN BAKER | : | (Criminal Appeal from Common Pleas Court) |
| Appellant | : | |

· · · · · · · · · ·

O P I N I O N

Rendered on July 3, 2024

· · · · · · · · · ·

CHRIS BECK, Attorney for Appellant

R. KELLY ORMSBY, III & DEBORAH S. QUIGLEY, Attorneys for Appellee

· · · · · · · · · · · ·

EPLEY, J.

{¶ 1} Dean Baker was convicted after a jury trial in the Clark County Court of Common Pleas of murder with a firearm specification, tampering with evidence, and abuse of a corpse. Baker appeals, claiming that his conviction for murder was based on insufficient evidence and was against the manifest weight of the evidence because the

State failed to disprove his claim of self-defense. He further argues that the trial court erred in revoking his bond the week before trial when no bond violation had occurred. For the following reasons, the trial court's judgment will be affirmed.

**I. Facts and Procedural History**

{¶ 2} In August 2022, Baker lived with his wife and her children in a single-family home in Greenville, Darke County. Corey Fleming was Baker's best friend, and he was staying in a detached garage behind the home. Baker also had a girlfriend, Ashlee Fletcher, who lived nearby.

{¶ 3} According to the State's evidence, sometime between 9:15 p.m. on August 7, 2022, and 6:27 a.m. on August 8, 2022, Baker shot Fleming once in the mouth while the two argued in Baker's kitchen. The bullet traveled into Fleming's brain, killing him. Baker wrapped Fleming's head and part of his body in plastic wrap and placed the body in his Cadillac Escalade.

{¶ 4} On August 8, 2022, Baker took Fleming's body to his place of employment, Cal-Maine, a large egg production facility. He left Fleming's body in a gray barn on the property. When Baker returned home that afternoon, he told his wife that he had kicked Fleming out because he had caught Fleming smoking methamphetamine in the garage. During the early morning hours of August 9, Baker and an accomplice (presumably Fletcher) went to Cal-Maine and apparently wrapped Fleming's body in plastic wrap. A couple of days later, Baker moved Fleming to a white barn at Cal-Maine and, beginning around 4:00 a.m. on August 12, he and an accomplice buried Fleming in a shallow grave behind that barn. During the burial, concrete was poured over Fleming's head.

{¶ 5} Over the next several days, Baker took steps to hide or destroy evidence of what he had done.

{¶ 6} On August 18, 2022, Baker went to the apartment of his friend, Nora, and asked her if he could burn items in her fire pit. When she asked what he had in his bucket, he wrote a note telling her that "10 days back I sacrificed my only male friend to Lucifer. I shot him in kitchen." Baker listed items he needed to dispose of and wrote that he "had him wrap[p]ed for 5 day." Nora did not allow Baker to burn the items, and she grabbed the note and tore it up. Later that day, Nora and her son-in-law took the torn note to the police. She said Baker had written it and that the friend's name was "Corey." Nora did not know Fleming.

{¶ 7} An investigation ensued during which the Greenville police and the Darke County Sheriff's Office gathered extensive evidence tying Baker to the murder. Fleming's body was located at Cal-Maine on August 20, 2022. On August 21, Baker and Fleming fled to Florida, where they were quickly apprehended. After his arrest, Baker made several written and oral statements related to the shooting.

{¶ 8} Baker ultimately was indicted in Darke County for murder with a firearm specification, tampering with evidence, and abuse of a corpse. In December 2022, the Darke County court granted Baker's motion for a change of venue and transferred the case to Clark County. On May 8, 2023, Baker filed a notice of self-defense, and a jury trial commenced on May 31, 2023. After an eight-day trial, the jury found Baker guilty of all offenses and the specification.

{¶ 9} The trial court proceeded directly to sentencing and imposed 15 years to life

for the murder with an additional three years for the firearm specification, three years for tampering with evidence, and one year for abuse of a corpse. The sentences were ordered to be served consecutively for an aggregate term of 22 years to life in prison.

{¶ 10} Baker appeals from his convictions, raising three assignments of error.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 11} In his first and second assignments of error, Baker claims that his conviction for murder was based on insufficient evidence and against the manifest weight of the evidence. He asserts that the State did not present evidence establishing that he did not act in self-defense. Baker does not challenge his convictions for tampering with evidence and abuse of a corpse.

### A. Relevant Legal Standards

{¶ 12} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 13} In contrast, "[a] weight of the evidence argument challenges the believability

of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19.   When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact.   Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.   *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).   A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances.   *Martin* at 175.

{¶ 14} Baker was charged with murder, in violation of R.C. 2903.02(A), which provides that "[n]o person shall purposefully cause the death of another * * *."   However, a person may act in self-defense, defense of another, or defense of that person's home. R.C. 2901.05(B)(1).

{¶ 15} To warrant an instruction on self-defense, there must be evidence presented by the defendant that (1) he or she was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only way to escape was the use of force, and (3) that the defendant did not violate any duty to retreat.   *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶ 14; *State v. Lovett*, 2d Dist. Montgomery

No. 29240, 2022-Ohio-1693, ¶ 41. We note that a person no longer has a duty to retreat before using force in self-defense "if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B). Accordingly, the law has "remove[d], in most cases, the duty to retreat before using self-defense." *State v. Degahson*, 2d Dist. Clark No. 2021-CA-35, 2022-Ohio-2972, ¶ 15; *State v. Trigg*, 2d Dist. Montgomery No. 29637, 2023-Ohio-3660, ¶ 32.

{¶ 16} If the defendant puts forth evidence that he or she acted in self-defense, the prosecution must prove beyond a reasonable doubt that the accused did not use force in self-defense. R.C. 2901.05(B)(1); *Lovett* at ¶ 40. The State's burden of disproving a defendant's self-defense claim beyond a reasonable doubt is subject to manifest weight review on appeal. *State v. Butler*, 2d Dist. Montgomery No. 29754, 2023-Ohio-3504, ¶ 17, citing *Messenger* at ¶ 27; *State v. Knuff*, Ohio Slip Opinion No. 2024-Ohio-902, __ N.E.3d __, ¶ 208 (a self-defense claim is not subject to review for sufficiency of the evidence). This is the proper analysis because the defendant claiming self-defense does not seek to negate an element of the crime, but rather to relieve himself from culpability. *Id.*, citing *State v. Lanier*, 8th Dist. Cuyahoga No. 110826, 2022-Ohio-240, ¶ 16.

{¶ 17} Circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 49. In some cases, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991).

**B. Evidence Regarding Self-Defense**

{¶ 18} According to Baker, on the evening of August 7, 2022, after his wife had left for work, he went to the garage to bring Fleming a soft drink and found Fleming smoking methamphetamine. Drug use was not permitted at the Bakers' home, and Fleming was aware of that. Baker became upset, yelled at Fleming, and told him to leave.

{¶ 19} Later that night, after he and his wife's children had gone to bed, Baker heard something in the house. He grabbed his 9mm Hi-Point from under his bed and went into the kitchen. There, he heard a voice say, "I'm going to take everything from you." Baker turned and saw Fleming pointing a gun in his face. When Fleming looked away, Baker raised his gun and fired, shooting Fleming once in the face. Baker testified that he had been terrified and had believed he was in imminent danger; he had not known if Fleming's gun was loaded. Baker stated that he immediately checked on the children after the shooting. He acknowledged that he did not call 911, but he testified that he did not have a phone.

{¶ 20} No one witnessed the shooting, and the exact reason for the confrontation is unknown. However, there was substantial evidence, particularly Baker's own actions and statements, from which the jury could have reasonably concluded that Baker's version of events was not credible and that Baker had not acted in self-defense.

{¶ 21} Between the shooting and the beginning of the police investigation, Baker engaged in a determined effort to hide or destroy evidence of the killing. He acknowledged that he had dragged Fleming's body outside, cleaned up his house, and enclosed Fleming's body in plastic wrap. The State's evidence showed that at

approximately 7:15 a.m. on August 8, 2022, after driving his wife's children to the babysitter, Baker drove to work at Cal-Maine in a silver Ford Mustang. He went inside and told his supervisor that he thought he had left his stove on at his house and asked for permission to return home to check. Baker left and returned to Cal-Maine approximately 40 minutes later in his Escalade. While at work, Baker put several items into a work pick-up truck, drove to his Escalade, transferred Fleming's body to the truck, and drove it into the gray barn. (Fleming's DNA was later found in the gray barn.) Baker then changed his shirt and cleaned out the pick-up truck.

{¶ 22} At approximately 3:15 a.m. on August 9, Baker and an accomplice (presumably Fletcher) returned to Cal-Maine and wrapped Fleming's body in plastic wrap in the gray barn. Baker did not work on August 9 or 10. At approximately 11:30 a.m. on August 11, Baker used a forklift to move Fleming's body to a white barn at Cal-Maine. Around 4:00 a.m. on August 12, Baker and an accomplice buried him behind that barn; the surveillance camera facing the white barn was covered while they did so, but other surveillance cameras captured movement there. During the next work day, Baker swept the area in front of the white barn. Two days later, on August 16, Baker saw a co-worker weed-whacking near where Fleming was buried. Baker took the weed whacker, said "let me do it," and cleared the area around Fleming's grave himself. The co-worker testified that Baker had never done that before.

{¶ 23} Baker repeatedly went to Fletcher's residence in the days following the shooting and left items with her. Officers later found Fleming's backpack hidden in a box outside of Fletcher's house. The backpack held several of his personal items, such as

his cell phone, hairbrush, markers, sunglasses, court documents, and vape pen.

{¶ 24} Baker also attempted to remove evidence from the Escalade. On August 13, Baker purchased new floor mats for the Escalade from the Walmart in Greenville. Officers later found them in Baker's garage. Fletcher's neighbors testified that they loaned her their Bissel Proheat upright carpet cleaner around 7:00 a.m. on August 14, 2022, and it was returned several hours later. The police towed the Escalade to a police impound lot on August 18. Detective Morrisa Reed testified that when she opened the vehicle's door, there was a strong chemical smell and she could see that it had recently been cleaned. The floor mats were missing. Nevertheless, Fleming's DNA was found on stains in the carpet located in the rear cargo area of the Escalade. A presumptive test for blood used on a swab from the bottom of the carpet cleaner tested positive, but the DNA profile was not sufficient for comparison. The neighbor testified that the carpet cleaner was six months old, had only been used three times, and had not been used by them to clean up blood.

{¶ 25} On August 18, Baker went to his friend Nora's apartment, seeking to use her firepit to destroy evidence contained in a white 5-gallon bucket. He also asked her to store two large Sterlite totes at her apartment. The note that Baker wrote listed items that he needed to dispose of. Nora stated that Baker wanted to burn the note, but she took it, tore it up, and told him, "There, it's done." Nora stated that Baker was "a little upset" and "disappointed" that she would not let him use her firepit or leave his containers there.

{¶ 26} Nora suggested that Baker take the items to his grandmother's residence,

a large property in Ithaca, Ohio. He did. During their search of Baker's grandmother's property, law enforcement officers located the two 18-gallon Sterlite totes next to her garage. One tote was inside a large black flex trash bag, and the other contained trash bags with several items inside. (Baker had purchased 33-gallon black flex trash bags on August 13.) The two totes held, among other things, plastic wrap on which decomposition fluid was present, ratchet straps, rope, a black rubber glove, mice bait, a mattress cover, and other items that had been used to store and transport Fleming's body. In a small shed in a different area of the property, officers located a white 5-gallon bucket containing more clear plastic stained with bodily fluids, an empty distilled water bottle, an empty Sakrete bag, a bandana with an Indian skull ring, a Calvin Klein shirt, and other items.

{¶ 27} Nora appears to have been the first person (other than Fletcher) who Baker told about the shooting. When Baker returned home after work on August 8, he informed his wife that he had instructed Fleming to leave because he had caught Fleming smoking methamphetamine in the garage. Baker did not mention to his wife that Fleming had come back and/or that he had shot Fleming. After Fleming went missing, the mother of Fleming's child had visited Baker's home to ask about Fleming's whereabouts; Baker told her Fleming was not there.

{¶ 28} The Greenville Police Department's investigation into Fleming's disappearance began on August 18, 2022, after Nora brought the note to Officer (now Detective) Dale Dickmann. Baker became aware of the investigation later that day, when Dickmann and Detective (now Sergeant) Joseph Monnin went to his residence to

speak with him.

**{¶ 29}** Baker neither admitted to shooting Fleming nor raised self-defense when he spoke with law enforcement officers on August 18. During his interaction with the police at his home, Baker told Monnin and Dickmann that he had picked up Fleming from the home of Fleming's girlfriend at about 5:00 p.m. on August 7, that he and Fleming later had an altercation due to Fleming's use of meth in the garage, that he had kicked Fleming out, and that Fleming had left.

**{¶ 30}** After allowing the officers to look through his home and garage, Baker agreed to appear at the police department to make a written statement. His written statement similarly said that he had kicked out Fleming for using drugs. Baker wrote that Fleming had come back a few days later and gathered the rest of his belongings but had not returned for the remaining few items. (State's Exhibit 2, the statement, was admitted into evidence, but the exhibit is not part of our record. Detective Monnin, however, read the exhibit at trial. *See* Trial Tr. 945-946.)

**{¶ 31}** After providing his written statement, Baker spoke with Detective Monnin in an interview room. He described how Fleming had lied to him and stolen from him, and Baker again indicated that he had told Fleming to leave after finding him using drugs. Baker said that he would never hurt Fleming and denied killing him. When asked about a "confession letter," Baker denied writing such a letter. When asked "what would you say if we had a confession letter?" Baker responded, "Then you got me." State's Ex. 3.

**{¶ 32}** After Fleming's body was recovered, Baker attempted to evade capture and fled the jurisdiction with Fletcher, his girlfriend. During the late afternoon on Saturday,

August 20, Baker left his residence on his motorcycle and did not return. On August 21, law enforcement officers located Baker's motorcycle at a residence north of Greenville. Two notes were left with his motorcycle, one to his friend and another to his wife. They both indicated that he was off on a journey "leading the lost." While attempting to locate Baker, detectives received information that Fletcher's Kia was traveling southbound and had been stopped in Knoxville, Tennessee. The U.S. Marshals tracked Fletcher's cell phone to Ocala, Florida, where she and Baker were apprehended on August 24, 2022. The license plate from the Kia had been removed and replaced with stolen plates.

{¶ 33} The mother of one of Baker's ex-girlfriends provided testimony suggesting that Baker had changed his appearance before he left Ohio. She testified that Baker came by in August 2022 and asked if she remembered him and if the police came by a lot. When she responded affirmatively, Baker left. The next afternoon, Baker returned, but she did not immediately recognize him. She testified that Baker had changed his appearance: he had shaved his head and wore a bandana. On August 23, she called the police and spoke with Detective Reed about her recent contacts with Baker.

{¶ 34} After Baker and Fletcher's apprehension, Detectives Monnin and Rebecca Prickett flew to Florida, and Detective Monnin interviewed Baker for approximately four hours on August 26. Baker and Monnin discussed what had occurred on the night of the shooting and the days following it. For example, Monnin asked about the verbal altercation with Fleming, evidence found at Cal-Maine, Fletcher's cleaning of the Escalade, how the totes were found at Baker's grandmother's house, and why he weed-wacked around Fleming's gravesite. Baker denied taking the totes to his grandmother's

home and seeing Fleming in the barns at Cal-Maine, and he provided explanations for some of his behavior around and following the shooting. However, he asserted that his conduct regarding Fleming was limited to kicking him out. Baker never admitted to shooting Fleming, and he did not claim to have acted in self-defense. To the contrary, he again stated that he had not hurt Fleming or moved his body. Baker disavowed knowledge of the note he wrote at Nora's residence. *See* State's Ex. 24.

{¶ 35} Baker testified that he had asserted that he acted in self-defense when speaking with Nora and later when he spoke with Detective Monnin on August 31, 2022, after he was returned to Darke County. However, Nora's testimony did not support his claim of self-defense. She testified that when she asked Baker what had happened, he told her the following:

> He said that the individual was in his kitchen pointing a gun at him saying, I know you had an affair with my girlfriend or fiancée and I could kill you right here. And I guess there, I don't know what else was said, some words were exchanged between each other. And Dean said, I assume the gun wasn't loaded so I took the gun away from him and I loaded the gun and I popped him between the eyes.

Trial Tr. 186.

{¶ 36} As for his one-and-a-half-hour interview with Detective Monnin on August 31, 2022, the State's evidence showed that Baker gave a variety of inconsistent statements and did not claim self-defense. Discussing the interview, Detective Monnin testified that he decided to suggest self-defense to Baker – something that Baker had

never raised himself – to get Baker to confess to the killing. *See* Trial Tr. 1019. Monnin continued: "So I go in there and I say, so Corey [Fleming] came into the house with a gun? Because there was a statement I think made by Nora that that might have been said initially. And so I'm trying to give him like the out of just giving me the final confession that he's killed Corey and so I'm the one who actually bring up the self-defense claim." Monnin indicated that Baker went along with it "[f]or a little while * * *. [Baker] says, yeah, Corey did come in [with] the gun but the gun was unloaded. I knew it was unloaded and I was able to get the gun away from him." Trial Tr. 1020. Baker never told Detective Monnin that he had killed Corey.

{¶ 37} Monnin further testified that he had told Baker that the prosecutor might be willing to make a deal. Baker had responded that he wanted Fletcher to walk free of everything and he would tell them what they wanted to know. Baker then noticed Monnin's recorder on the table, got angry, and asked the detective to erase it. Monnin stopped the recording but did not erase it. Baker then told Monnin that the prosecutor should leave it as "aggravated" (meaning aggravated murder), that he was a "bad person," and that he deserved it. Several minutes later, Baker claimed that he did not know who pulled the trigger and suggested that Fleming may have died by suicide. Soon after, Baker suggested that he planned the killing "if it cancels out what I said before." State's Ex 81. Baker also pointed Detective Monnin toward other suspects, such as Fletcher's husband, the Cal-Maine security guard, and Fleming's former girlfriend.

{¶ 38} The State also refuted Baker's claim of self-defense with the testimony of Daniel Campbell, who was incarcerated with Baker at the Darke County Jail on

September 1, 2022.   In a September 12, 2022 letter to Fletcher, Baker wrote that the two had "bonded, became family within seconds" and that he had shared stories about "sh*tpants."   State's Ex. 118.

{¶ 39} According to Campbell, Baker had learned that Fletcher had spent the night with Fleming in the garage, that Baker and Fleming had gotten into a "heated argument inside the house," and that Baker had retrieved a gun from his bedroom and shot Fleming. Trial Tr. 737.   Baker told Campbell that he had used his wife's .380 caliber handgun. Campbell continued:

> * * * He said he shot him in the face.   He just pointed in the face area.   He said he shot him one time in the face.   He said the bullet, it went all the way through.   Corey fell straight down to the floor and when he did, he started to bleed and he went and got plastic wrap and wrapped his face up with plastic wrap. * * * He said that after he shot him he told him, I told you, mother-f-er, I was going to kill you.

Trial Tr. 738.

{¶ 40} Campbell testified that Fleming's bladder and bowels reportedly released while Baker was cleaning up the small amount of blood on the floor, so Baker wrapped Fleming's body section in plastic wrap and then dragged him to the garage.   Baker then called Fletcher.   He told her what he had done, and they borrowed Baker's mother's truck to move Fleming's body to Cal-Maine, where Baker worked.   Baker told Campbell that they had used ratchet straps to hold the body in the truck and had planned to leave the body by the house next to Cal-Maine, where Fletcher's husband lived.   However,

because Fletcher's husband was home, they took Fleming's body and buried him behind a maintenance building on the Cal-Maine property. While doing so, they poured cement over Fleming's face and covered the hole. Campbell understood that this all happened the same night as the murder.

{¶ 41} Campbell further relayed that Baker had described what he had done with evidence of the crime. Campbell said that the ratchet straps, plastic wrap, and other things were taken to his grandmother's house. The truck reportedly was taken back to his mother's house after cleaning it and getting new floor mats.

{¶ 42} Finally, Baker wrote numerous letters from jail in which he asserted that he was innocent of killing Fleming and speculated about who might be responsible instead. *See* State's Exs. 116-132, 900-901. Several letters accused Baker's wife of the murder, and in one letter sent to his mother, Baker described a plan to frame his wife. *See, e.g.,* State's Ex. 123, 129, 132. His letters also conveyed explanations that he was giving for his actions, such as that he had gone to Florida to look for work in advance of moving there with hi wife and that Fletcher had come with him because he had used her car. *E.g.*, State's Ex. 119. Baker was surprised to learn that his letters sent to people outside the jail had been read by jail personnel. State's Exs. 105, 111.

{¶ 43} In his closing argument, defense counsel highlighted that Fleming had free rein within the Bakers' home, that his fingerprints were found on the magazine of his wife's .380 firearm (a different weapon than what Baker said he had used), and that methamphetamine was found in Fleming's system during his autopsy. Counsel reiterated that Baker had mentioned self-defense to Nora while he was with her.

Addressing the elements of self-defense, counsel argued that Baker had had no duty to retreat in his own home, that Fleming had pointed a gun at Baker, that Baker could have had an honest belief that the gun was loaded when the shooting occurred, and that Baker had not created the situation when he was approached by his friend, who was recently evicted and high on meth.

{¶ 44} Baker testified at length at trial, and he offered various explanations for many of his actions and for his writings. It was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State had proven beyond a reasonable doubt that Baker had committed the shooting and not acted in self-defense. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2d Dist. Montgomery No. 29061, 2021-Ohio-3947, ¶ 27. Upon review of the evidence, we cannot conclude that the jury lost its way when it ostensibly credited the State's witnesses and found that Baker had not acted in self-defense when he shot and killed Fleming. Indeed, Baker's behavior and statements prior to trial strongly supported a conclusion that he did not. Baker's conviction for murder was based on sufficient evidence and was not against the manifest weight of the evidence.

{¶ 45} Baker's first and second assignments of error are overruled.

### III. Bond Modification

{¶ 46} Baker's third assignment of error asserts that the trial court erred in revoking his bond the week before trial when no bond violation had occurred.

{¶ 47} The record reflects that the court modified Baker's bond from $150,000

(which he had posted) to $500,000 on May 25, 2023. However, Baker has now been convicted of the charged offenses. Any error concerning pretrial bail is moot once a conviction has occurred. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 206; *State v. Smith*, 2d Dist. Montgomery No. 28265, 2019-Ohio-5015, ¶ 44. Accordingly, Baker's third assignment of error is overruled as moot.

## IV. Conclusion

{¶ 48} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.