[Cite as *State v. Boyer*, 2025-Ohio-2627.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

JOSEPH L. BOYER,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 CO 0046**

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2022 CR 424

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Vito J. Abruzzino*, Columbiana County Prosecutor, *Atty. Danielle Menning* and *Atty. Tammie M. Jones*, Assistant Prosecuting Attorneys, for Plaintiff-Appellee and

*Atty. Edward F. Borkowski, Jr.,* for Defendant-Appellant.

Dated:  July 25, 2025

**HANNI, J.**

{¶1} Defendant-Appellant, Joseph L. Boyer, appeals from a Columbiana County Common Pleas Court judgment convicting him of felonious assault and domestic violence following a jury trial. Appellant now argues his trial counsel was ineffective, his convictions were against the manifest weight of the evidence, and the trial court erred in refusing to provide a jury instruction on aggravated assault. Appellant's counsel was not ineffective, the jury's verdict was not against the manifest weight of the evidence, and an instruction on the inferior-degree offense of aggravated assault was not warranted. Therefore, Appellant's convictions are affirmed.

{¶2} Appellant and C.P. had been involved in a romantic relationship and lived together for several years. In June of 2022, Appellant was convicted of domestic violence against C.P. and a no contact order was issued ordering Appellant to stay away from C.P.

{¶3} In the morning hours of July 7, 2022, East Liverpool Police Officer Jay Lane responded to a call from the East Liverpool City Hospital regarding a female who had suffered stab wounds. There, Officer Lane found C.P. in the emergency department with three large open knife wounds to her neck and an injury to her wrist. C.P. told the officer that Appellant caused her injuries. C.P. also told the officer that she was concerned for her roommate, J.T., who was still at her house with Appellant.

{¶4} Officer Lane and other officers then went to C.P.'s house. Appellant attempted to flee from a window in the rear of the house. When he caught sight of one of the officers, Appellant stated "fuck you" and went back inside through the window. The officers entered the house through the left side door and noticed blood above the door knob. Upon entering the house, the officers were able to secure Appellant. Officer Lane noted that Appellant had blood on his clothing but was not injured. He stated that Appellant was belligerent and uncooperative.

{¶5} C.P.'s roommate, J.T., was sitting on the couch uninjured. She did not provide police with any information as to what happened.

{¶6} In the living room, police observed a pool of blood on the couch. They also found two large knives with blood on them on either side of the television stand.

Case No. 24 CO 0046

{¶7} Appellant was arrested and transported to the police station. He did not appear to have any injuries and when asked by police, Appellant stated he was not injured.

{¶8} According to C.P., she was asleep on her living room couch. She had been drinking the night before and was still intoxicated when she awoke to Appellant grabbing her hair, yelling at her, and accusing her of cheating on him. C.P. stated that Appellant retrieved two knives from the butcher block in the kitchen. She said Appellant cut her neck, throat, collarbone area, and wrist. During the attack, Appellant told C.P. he was going to kill her. C.P. said that she managed to kick Appellant in the groin and escape outside. She called her friend, who was already on his way, who picked her up and took her to the hospital.

{¶9} According to Appellant, he was intoxicated on the morning of July 7. Appellant claimed he still lived with C.P. at the time, despite the no contact order she had against him. Appellant stated he had been drinking across the street on July 6 and was still intoxicated when he went home to find C.P. asleep in the bedroom. Appellant stated he woke her up and the two had sex. He then went into the living room where their roommate J.T. was sitting on the couch. J.T. then informed Appellant that C.P. was sleeping with a man named E.G. At that time, C.P. entered the room and began yelling at J.T. Appellant and C.P. then started to argue. Appellant stated he was "pretty mad." They continued to argue and C.P. grabbed a knife from the kitchen. Appellant tried to take the knife from her, which resulted in a struggle on the couch for control of the knife. Appellant stated that C.P.'s neck was cut during the struggle for the knife. He stated that C.P. then reached for a second knife and when she did, he stabbed her wrist to stop her.

{¶10} On September 14, 2022, a Columbiana County Grand Jury indicted Appellant on one count of attempted felony murder[1]; one count of felonious assault, a

---

[1] As we set out in Appellant's fist appeal:

> [A]ttempted felony murder is not a cognizable crime in Ohio because attempted felony murder requires proof of a mens rea of purposely or knowingly, but felony murder does not. A felony murder charge can arise from an unintended or accidental death. [State v. Nolan, 2014-Ohio-4800] at ¶ 10. Felony murder is, in essence, a strict liability crime with no need for the state to prove a mens rea for murder. A crime charged under the attempt statute, R.C. 2923.02, on the other hand, requires proof of specific intent. Id. at ¶ 7. "Attempted felony murder" is contradictory, because it would contain a mens rea requirement for a crime that does not have a mens rea

second-degree felony in violation of R.C. 2903.11(A)(2); and one count of domestic violence, a fourth-degree felony in violation of R.C. 2919.25(A). Appellant initially pleaded not guilty.

{¶11} On January 10, 2023, Appellant changed his plea to guilty to felonious assault and domestic violence. On February 10, 2023, Appellant filed a presentence motion to withdraw his guilty plea. The trial court held a hearing on the motion and denied it. The court sentenced Appellant on April 24, 2023 to eight to 12 years in prison for felonious assault and 12 months in prison for domestic violence, to be served consecutively. After sentencing, the court dismissed the attempted felony murder count.

{¶12} Appellant filed an appeal asserting he did not enter his plea knowingly, voluntarily, and intelligently. This Court agreed. On March 21, 2024, we found Appellant was led to believe by his counsel, the prosecutor, and the trial judge that he was benefitting from a plea agreement in which the most severe count in the indictment, attempted felony murder, would be dismissed if he pleaded guilty to the other counts in the indictment. *State v. Boyer*, 2024-Ohio-1319, ¶ 23 (7th Dist.). But the attempted felony murder charge was required to be dismissed because it cannot be prosecuted in Ohio, which was not explained to Appellant. *Id*. Consequently, we reversed Appellant's conviction and remanded the matter for further proceedings.

{¶13} Appellant proceeded to a jury trial in October 2024 on the felonious assault and domestic violence counts. The jury found Appellant guilty as charged. The trial court subsequently sentenced Appellant to eight to 12 years for felonious assault and 18 months for domestic violence, to be served concurrently.

{¶14} Appellant filed a timely notice of appeal on November 12, 2024. He now raises three assignments of error. We will address Appellant's second assignment of error first for ease of discussion.

{¶15} Appellant's second assignment of error states:

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

---

requirement. Put another way, "felony murder [is] a strict-liability offense and an 'attempt' [is] a specific-intent offense." *State v. Urbanek*, 2023-Ohio-2249, 220 N.E.3d 146, ¶ 36 (6th Dist.). *State v. Boyer*, 2024-Ohio-1319, ¶ 14 (7th Dist.)

Case No. 24 CO 0046

{¶16} Here, Appellant argues his convictions were against the manifest weight of the evidence. He asserts this case came down to weighing his credibility against C.P.'s credibility. Appellant claims C.P. was not credible. He points to evidence that C.P. was drinking the night before and was still intoxicated at the time of the assault. And he points to inconsistencies in her testimony regarding where she was sleeping when he came into the house. Appellant then urges that his testimony was more credible than C.P.'s testimony. He points out that he admitted his shortcomings (i.e., his drinking, "short fuse," and living with C.P. despite a no-contact order). Appellant argues that if he had attacked C.P., he would not have remained at the house but instead would have fled.

{¶17} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380 (1997). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id*. at 387, quoting *Black's Law Dictionary* (6 Ed.1990) (Emphasis sic). In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id*. at 390.

{¶18} Only when "it is patently apparent that the factfinder lost its way," should an appellate court overturn the jury verdict. *State v. Woullard*, 2004-Ohio-3395, ¶ 81 (2d Dist.). If a conviction is against the manifest weight of the evidence, a new trial is to be ordered. *Thompkins*, 78 Ohio St.3d at 387. "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." *State v. Miller*, 2002-Ohio-4931, ¶ 36 quoting Ohio Const., art. IV, § 3(B)(3).

{¶19} The jury convicted Appellant of felonious assault in violation of R.C. 2903.11(A)(2), which provides: "No person shall knowingly . . . [c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

**{¶20}** The jury also convicted Appellant of domestic violence in violation of R.C. 2919.25(A), which provides: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." If the offender was previously convicted of domestic violence, the offense is a fourth-degree felony. R.C. 2919.25(D)(3).

**{¶21}** We must consider the evidence to determine if it supports the jury's verdict.

**{¶22}** Officer Lane was the State's first witness. The officer testified that he responded to a call from the hospital at 7:40 a.m. regarding a woman who had been stabbed. (Tr. 151). He stated that he found C.P. at the hospital and observed that she had three large open wounds on her neck. (Tr. 152-153). He also saw that an injury to her wrist had already been bandaged. (Tr. 162). Officer Lane spoke with C.P. (Tr. 153). He stated that she was coherent and able to answer his questions. (Tr. 153). C.P. told him that Appellant had done this to her. (Tr. 153). Officer Lane was familiar with Appellant and C.P. due to Appellant's recent domestic violence conviction. (Tr. 154). He identified a certified copy of Appellant's domestic violence judgment entry. (Tr. 154; State Ex. 23). Officer Lane also testified that C.P. expressed concern to him for her roommate's safety because Appellant and the roommate were still at her house. (Tr. 157).

**{¶23}** Additionally, Officer Lane took photographs of C.P.'s injuries. (Tr. 158-159). The photographs of C.P.'s neck are quite gruesome. (State Exs. 1, 2). They depict three large gaping wounds: one on the right side of her neck, one on the left side of her neck, and one on her left collarbone area. (State Exs. 1, 2).

**{¶24}** Officer Lane testified that after photographing C.P.'s injuries, he and other officers went to C.P.'s house. (Tr. 165-166). They knocked on the door on the right of the house and saw someone moving inside. (Tr. 167). At that time, Appellant attempted to flee through a window at the rear of the house. (Tr. 168). When Appellant saw that the police captain was outside, Appellant stated "fuck you" and went back inside through the window. (Tr. 168). Officer Lane noticed there was blood on the outside of the left-side door. (Tr. 168).

**{¶25}** Once the officers were inside and had detained Appellant, Officer Lane noticed that Appellant had blood on his clothing yet he did not have any injuries. (Tr. 172). The officer stated that Appellant was uncooperative, belligerent, and appeared to be intoxicated. (Tr. 172, 206). He also testified that J.T. was inside the house and was

Case No. 24 CO 0046

unharmed. (Tr. 172). Officer Lane also observed that there was a pool of blood in front of the living room couch and two knives with blood on them on either side of the television stand. (Tr. 173-174). He stated that the knives were "quite large, and could be deadly." (Tr. 174). Finally, Officer Lane testified that Appellant did not report that he was injured and did not have any defensive wounds on him. (Tr. 190-191).

{¶26} C.P. was the State's next witness. She testified that she was asleep on the couch when Appellant woke her up by grabbing her hair and screaming at her about cheating on him. (Tr. 219-220). C.P. stated that she yelled back at Appellant and then he started to attack her. (Tr. 221). She testified that Appellant had a knife from her butcher block and was attacking her neck with it. (Tr. 222). She stated that Appellant cut her by her throat and by her collarbone. (Tr. 223). At some point, Appellant picked up another knife. (Tr. 223). C.P. tried to fight Appellant off. (Tr. 223). She stated Appellant also stabbed her wrist. (Tr. 224). During the attack, C.P. stated that Appellant told her he "had to do this" and that he was going to kill her. (Tr. 224).

{¶27} C.P. stated that she managed to kick Appellant in the groin to get away. (Tr. 225). She grabbed her phone and called her friend E.G., who was already on his way. (Tr. 225-226). C.P. was able to run out of the house and got into E.G.'s car. (Tr. 226). Appellant followed her out of the house and was banging on E.G.'s window and yelling at him. (Tr. 226). She stated that E.G. then drove her to the hospital. (Tr. 226).

{¶28} As to her injuries, C.P. testified that she was taken by life flight from East Liverpool City Hospital to Mercy Health in Youngstown. (Tr. 228). She stated one of the injuries to her neck had to be stitched from the inside and then again on the outside layer. (Tr. 229). She required surgery to her wrist to repair two tendons that were severed to her fingers, nerve damage to her thumb, and she had to have a pin surgically put in her arm. (Tr. 227-228). C.P. then required six months of physical therapy to regain mobility in her hand and may still require another surgery. (Tr. 229).

{¶29} C.P. went on to testify that after this incident, she continued to hear from Appellant through phone call and letters. (Tr. 231). She stated he did not want her to come to court. (Tr. 232). C.P. denied ever using a knife to attack Appellant. (Tr. 232).

{¶30} On cross-examination, C.P. admitted to drinking "quite a bit" during the time in her life when this incident occurred. (Tr. 234). She stated she was drinking half a

gallon of vodka a day. (Tr. 234). And she acknowledged that at the time of the attack she was still under the influence of alcohol from the night before. (Tr. 237). She also admitted that she had previously reported to police that this incident had started in the bedroom as opposed to in the living room as she testified. (Tr. 235).

{¶31} E.G. testified next. He stated that he was at home on the morning of the incident when C.P. called him and asked him to come pick her up because Appellant was at her house and she was worried something was going to happen. (Tr. 264-265). When he arrived at C.P.'s house, E.G. stated that C.P. was walking down the driveway covered in blood. (Tr. 265). He testified that C.P. wanted to go to his house to tend to her injuries but he insisted on taking her to the hospital. (Tr. 265-266). He described the cuts to C.P.'s neck as "gaped open." (Tr. 266). E.G. stated that Appellant followed C.P. to his car and punched his window while yelling that he was going to kill E.G. too. (Tr. 267). E.G. then drove C.P. to the hospital. (Tr. 268).

{¶32} Jennifer Tedrow was the next witness. She is a criminal investigator for the Columbiana County Prosecutor's Office who testified regarding phone calls she reviewed from Appellant to C.P. while he was in jail awaiting trial. Recordings of the calls were also played for the jury. (State Ex. 25). During a July 22, 2022 phone call, Appellant told C.P. that he loved and missed her and that he "didn't believe that he went down and pick that - - did that to her and picked that knife up." (Tr. 296). Appellant later admitted to having the two knives that were found in the living room. (Tr. 296-297). Later in the call, C.P. said to Appellant, "You told me you fucking love me, and you tried to kill me too." (Tr. 297). Appellant did not deny this. (Tr. 297). Instead, Appellant told C.P., "Thank your girlfriend [J.T.]". (Tr. 298).

{¶33} The State's last witness, Marisha Heaven, was a corrections officer at the Columbiana County Jail when Appellant was booked. She transported Appellant from booking to "video court" the day after he was arrested. (Tr. 306). Heaven asked Appellant what he was doing back in jail. (Tr. 307). Appellant responded that his girlfriend had cheated on him and he cut her throat. (Tr. 307). Heaven stated that Appellant said this very calmly. (Tr. 308). She asked Appellant if he was joking and he responded "no". (Tr. 308). Heaven later reported Appellant's statements to the sheriff. (Tr. 309). She testified

that Appellant found out about her report. (Tr. 310). She then was not permitted to work on the pod where Appellant was housed because he threatened to kill her. (Tr. 310-311).

**{¶34}** Appellant testified in his own defense. He stated that he and C.P. lived together. (Tr. 333). The two were heavy drinkers. (Tr. 333). Appellant admitted that he had been convicted of domestic violence against C.P. just a month before the incident in question. (Tr. 335-336). He also stated that he continued to live with C.P. despite the resulting no-contact order. (Tr. 337).

**{¶35}** On July 6, 2022, Appellant stated that he and C.P. had been drinking and got into an argument so he left and went across the street to a neighbor's house. (Tr. 338). Appellant continued to drink at the neighbor's house until he eventually fell asleep. (Tr. 340). The next morning, Appellant awoke and was still intoxicated. (Tr. 340). Appellant stated that he went back to his/C.P.'s house and went into the bedroom where he found C.P. asleep. (Tr. 341). Appellant stated that he woke her up and they had sex. (Tr. 341-342). He stated that they were both still intoxicated from the previous night. (Tr. 342). Appellant stated that he then went into the living room where J.T. was sitting on the couch. (Tr. 342). J.T. told Appellant that C.P. was cheating on him with E.G. (Tr. 344). C.P. entered the living room at that time and an argument ensued. (Tr. 345).

**{¶36}** Appellant testified that he and C.P. were both yelling at each other. (Tr. 347-348). He stated that at some point, C.P. went into the kitchen and grabbed a knife. (Tr. 350). Appellant tried to take the knife from C.P. and a struggle ensued. (Tr. 351). Appellant stated that they both landed on the couch and continued to struggle for control of the knife. (Tr. 353). Eventually, Appellant stated, he managed to get the knife from C.P. and then he noticed that she had been cut. (Tr. 353). Appellant testified, "this was a total accident, I never tried to hurt - - I love that woman." (Tr. 353). Appellant stated that C.P. next reached for another knife that was sitting on a plate nearby. (Tr. 354-355). When C.P. reached for this knife, Appellant stated that he stabbed her in the hand with the knife he was holding. (Tr. 355-356).

**{¶37}** Next, Appellant stated that C.P. called E.G. to come pick her up. (Tr. 358-359). Appellant testified that he told C.P. he loved her but that he did not want her back in their house. (Tr. 359). He stated that when E.G. pulled into the driveway, Appellant followed C.P. out. (Tr. 359). He admitted to pounding on E.G.'s car window and

threatening him. (Tr. 360). Appellant stated that after C.P. left, he went back into the house and began drinking again. (Tr. 363).

{¶38} The manifest weight of the evidence supports Appellant's convictions.

{¶39} First, there is no conflicting evidence regarding the felony domestic violence conviction. Officer Lane identified a certified copy of the judgment entry of Appellant's prior conviction. And Appellant admitted to this prior conviction. And whether the jury believed C.P.'s version of the events or Appellant's version of the events, in either case the evidence demonstrated that Appellant knowingly caused physical harm to C.P., who was a household member.

{¶40} Second, as to the felonious assault conviction, the evidence as to many of the facts was agreed to by both C.P. and Appellant. They both testified that Appellant came into the house early in the morning of July 7, 2022. They both agreed that they had been drinking heavily the previous night. Both testified that Appellant was angered by J.T.'s statement to Appellant that C.P. was cheating on him. Both Appellant and C.P. testified there was an argument that resulted in C.P. suffering knife wounds to her neck. And Appellant admitted to causing the knife wound to C.P.'s wrist.

{¶41} Appellant told a different version of the events than C.P. only as it pertained to what preceded the altercation and how C.P. sustained the neck wounds.

{¶42} According to Appellant, C.P. was asleep in the bedroom when he entered the house. He woke her up and the two had sex before making their way to the living room. Then J.T. told Appellant that C.P. was cheating on him, which caused him to start yelling at C.P. C.P. then retrieved a knife, the two struggled over it, and C.P.'s neck was cut during the struggle. The two eventually stopped struggling.

{¶43} According to C.P., she was asleep either on the living room couch or in the bedroom. Appellant woke her up by pulling her hair and yelling at her for cheating on him. Appellant retrieved a knife and cut her neck with it in multiple places. He then picked up a second knife and stabbed her wrist. C.P. managed to get away by kicking Appellant in the groin.

{¶44} Corroborating C.P.'s testimony are the photographs of her injuries. The photographs of the wounds to her neck and collarbone area show three large gaping

"slash" type wounds. (State Exs. 1, 2). It is difficult to believe that these three wounds were the result of a mutual struggle over a knife.

{¶45} The evidence also demonstrated that when police arrived on the scene, Appellant attempted to flee from a window. He only retreated and went back inside upon seeing the police captain. Additionally, Appellant was covered in blood yet he was uninjured. Moreover, in his jailhouse phone calls to C.P., Appellant essentially confessed to attacking her.

{¶46} Which witness to believe was a matter of credibility for the jurors to determine. The jury in this case was able to listen to C.P.'s and Appellant's testimony while viewing them on the witness stand. They clearly determined C.P. to be the more credible witness. Although an appellate court is permitted to independently weigh the credibility of the witnesses when determining whether a conviction is against the manifest weight of the evidence, we must give deference to the fact finder's determination of witnesses' credibility. *State v. Jackson*, 2009-Ohio-6407, ¶ 18 (7th Dist.). The policy underlying this presumption is that the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶47} The evidence was clear that Appellant knowingly caused physical harm to C.P. by means of a deadly weapon. In fact, even without the evidence of the serious wounds to C.P.'s neck, Appellant himself admitted to stabbing C.P. in the hand/wrist with a knife. Based on the above, Appellant's convictions are not against the manifest weight of the evidence.

{¶48} Accordingly, Appellant's second assignment of error is without merit and is overruled.

{¶49} Appellant's first assignment of error states:

APPELLANT'S COUNSEL WAS INEFFECTIVE.

{¶50} Appellant claims his trial counsel was ineffective for failing to move to bifurcate the domestic violence count and to try that count to the bench rather than to the jury. He points out that because the charges were tried together, the jury heard evidence that he had recently been convicted of domestic violence against C.P. and that there was

a no-contact order in place. He claims this was a case of he-said/she-said and that by permitting the jury to hear evidence of his previous domestic violence against C.P. the jury was persuaded to believe C.P.

**{¶51}** To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, the appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. Second, the appellant must demonstrate that he was prejudiced by counsel's performance. *Id*. To show that he has been prejudiced by counsel's deficient performance, the appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, at paragraph three of the syllabus.

**{¶52}** Appellant bears the burden of proof on the issue of counsel's ineffectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289 (1999). In Ohio, a licensed attorney is presumed competent. *Id*.

**{¶53}** The better practice in a case such as this would likely have been to request to bifurcate the domestic violence charge from the felonious assault charge for trial. Nonetheless, Appellant cannot meet the prejudice prong here. As discussed in detail above, the evidence on the felonious assault charge weighed heavily against Appellant. It was undisputed that Appellant was angered when he learned C.P. had been cheating on him. It was undisputed that Appellant stabbed C.P. in the hand/wrist with a knife, causing serious injury. It was undisputed that C.P. suffered three serious knife wounds to her neck and collarbone area. It was undisputed that Appellant attempted to flee from a window when he saw the police. Appellant told a corrections officer that he cut his girlfriend's throat because she cheated on him. And Appellant expressed his remorse over attacking C.P. in his jailhouse phone calls to her. Moreover, the evidence of Appellant's prior domestic violence conviction was minimal. It was limited to the simple fact that Appellant had a prior domestic violence conviction where C.P. was the victim. No details were provided.

**{¶54}** Based on all of the evidence, Appellant is unable to demonstrate that but for counsel's possible error, the result of his trial would have been different. Even without

the evidence of Appellant's prior domestic violence conviction, the evidence of the felonious assault was so convincing that the result of the trial would not have been different.

**{¶55}** Accordingly, Appellant's first assignment of error is without merit and is overruled.

**{¶56}** Appellant's third assignment of error states:

THE TRIAL COURT ERRED BY REFUSING TO PROVIDE A JURY INSTRUCTION ON AGGRAVATED ASSAULT.

**{¶57}** At the conclusion of the evidence, Appellant's counsel requested an instruction on the inferior-degree offense of aggravated assault. (Tr. 388). The trial court denied the request stating that there was insufficient evidence of sudden passion or serious provocation by the victim as is required for such an instruction. (Tr. Tr. 388-390).

**{¶58}** Appellant now argues that because he presented evidence of serious provocation, the trial court should have given a jury instruction on the inferior-degree offense of aggravated assault. He contends that the fact that he had just learned from J.T. that C.P. was cheating on him was sufficient provocation to warrant the instruction. And while he acknowledges there is case law holding that "mere words" do not constitute sufficient provocation, he urges this Court to also consider his mental and emotional state at the time.

**{¶59}** Aggravated assault is an inferior-degree offense of felonious assault. *State v. Holcomb*, 2020-Ohio-561, ¶ 30 (7th Dist.), citing *State v. Deem*, 40 Ohio St.3d 205, 210-211 (1988). The elements of these two crimes are identical except that aggravated assault contains the additional mitigating element of serious provocation. *Id*. "[I]n a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury." *Deem*, 50 Ohio St. 3d at paragraph four of the syllabus.

**{¶60}** Provocation is "serious" when it brings on extreme stress and is reasonably sufficient to incite the defendant into using deadly force. *Id*. at paragraph five of the syllabus.

**{¶61}** In determining if serious provocation was reasonably sufficient to bring about a sudden fit of rage or passion, a two-part test is applied. First, the court must

apply an objective standard to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. *State v. Mack*, 82 Ohio St.3d 198, 201 (1998). In other words, "the provocation must be 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.'" *Id*., quoting *State v. Shane*, 63 Ohio St.3d 630, 635 (1992). Second, if the objective standard is met, the court must then apply a subjective standard, "to determine whether the defendant in the particular case "'actually was under the influence of sudden passion or in a sudden fit of rage.'" *Id.*, quoting *Shane* at 634-635. The court should keep in mind that in most instances, words alone will not constitute reasonably sufficient provocation to incite the use of deadly force. *Id*., citing *Shane* at paragraph two of the syllabus.

**{¶62}** In determining whether to include an instruction on an inferior-degree offense, the trial court is not to weigh the evidence. Instead, the court must consider both the state's and the defense's evidence and must view that evidence in a light most favorable to the defendant. *State v. Monroe*, 2005-Ohio-2282, ¶ 37.

**{¶63}** The circumstances in this case do not rise to the level of sufficient evidence of serious provocation such as to incite the use of deadly force. Viewing the evidence in the light most favorable to Appellant would show the following. Appellant was informed by J.T. that C.P. had been cheating on him and that C.P. may have engaged in sexual relations with another man a few hours before she and Appellant had sex. But Appellant and C.P. were not married. And Appellant did not catch C.P. "in the act" of cheating on him. Even construing the evidence in the light most favorable to Appellant, we are left with "mere words" uttered by a third party, which are not sufficient to incite a defendant to use deadly force. Thus, the trial court properly denied the inferior-offense instruction.

**{¶64}** Accordingly, Appellant's third assignment of error is without merit and is overruled.

**{¶65}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

Robb, P.J., concurs.

Case No. 24 CO 0046

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**