[Cite as *State v. Jones*, 2025-Ohio-3294.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30333 |
| Appellee | : | |
| | : | Trial Court Case No. 2023 CR 02397 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| JASHAWN LEE JONES | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on September 12, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

MICHAEL L. TUCKER, JUDGE

HUFFMAN, J., and HANSEMAN, J., concur.

**OPINION**
MONTGOMERY C.A. No. 30333


CHIMA R. EKEH, Attorney for Appellant
MICHAEL P. ALLEN, Attorney for Appellee


TUCKER, J.

{¶ 1} Jashawn Lee Jones appeals from his convictions of murder with firearm specifications and two counts of having weapons while under disability. He raises six assignments of error: (1) the trial court abused its discretion in granting the State's motion to dismiss a charge of reckless homicide; (2) he was denied a public trial; (3) the trial court erred in admitting a witness's prior consistent statement at trial; (4) the State failed to prove that he did not act in self-defense; (5) the trial court erred in failing to instruct the jury on voluntary manslaughter; and (6) cumulative errors violated his right to a fair trial. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} Jones's convictions stemmed from his fatal shooting of the victim on August 10, 2023. Although the eyewitnesses' testimonies varied to some degree, the State's evidence supports the following facts.

{¶ 3} On the date of the incident, Jones lived in a home in Dayton with several people, including his girlfriend, Aaliyah, and Aaliyah's cousin, Toni. Two dogs lived there as well. Aaliyah's best friend, Chyna, was visiting that day, along with her boyfriend, Jerry. The group drank liquor and smoked marijuana. According to Aaliyah, Jones and Jerry were drunk, and at 4:00 p.m., Jones was asleep or passed out on the downstairs couch.

{¶ 4} Shortly after 4:00 p.m., the victim went to Jones's residence to complain about Toni's dog, Savage. The dog was known to jump the backyard fence and bite people in the

public alley that ran along the side of the house. The victim had previously been to the house to complain about the dog, as had other people. Aaliyah answered the door. When the victim said why he was there, Aaliyah told him to leave them alone and "get the f*ck off my porch" and slammed the door. Jones awoke.

{¶ 5} According to Toni, one of her children reported that the victim threatened to kill Savage if he saw the dog again. When Toni heard about the threat, she went outside, looking for the victim. The victim had started walking down the alley, but when he heard Toni asking where he had gone, he returned. Toni brought her dog outside, and a verbal confrontation in the front yard ensued, during which Toni yelled loudly at the victim. As the verbal confrontation ended, Jones exited the home, carrying two guns—a .22-caliber long rifle handgun and a 9 mm handgun; Jerry and Chyna followed him out.

{¶ 6} Jones and Jerry approached the victim, who had started backing away with his hands raised. Aaliyah and Chyna testified that Jones and Jerry tried to get the victim to leave. As the three men stood near the edge of the premises of Jones's residence, Jones pistol-whipped the victim, knocking him to the ground. Jerry also assaulted the victim.

{¶ 7} The victim crawled backward and stood up, and Jones continued the confrontation. The victim displayed a bottle of pepper spray, and Jones responded that he would shoot if the victim sprayed him. The victim sprayed Jones in the face. Jones fired seven shots from the 9 mm handgun, two of which hit the victim in the head, killing him. The victim spun and fell face first to the pavement. The shooting occurred by the curb in front of the home across the alley from Jones's residence.

{¶ 8} The police responded within minutes. By that time, Jones and Aaliyah had gone back inside their residence where Jones washed out his eyes with milk and changed his clothes. Others went to the home next door, away from the alley, where members of

Aaliyah's family lived. The police spoke with witnesses and quickly learned that Jones was the shooter. Jones exited his residence and spoke with a detective, initially denying knowledge of the shooting. Jones was taken to the police station for an interview where he claimed that another person—whom he acknowledged at trial was fictitious—had done it. Ultimately, Jones admitted to shooting the victim. The next day, a neighbor, Michael, was shown a photospread, and he identified Jones as the shooter.

{¶ 9} The police located the .22-caliber weapon in front of Jones's home, but the 9 mm firearm was never found. Seven spent 9 mm cartridge casings were recovered from the front yard of the residence across the alley from Jones's home. The victim's sunglasses were in the grassy area between the sidewalk in front of Jones's residence and the street. The victim was found with a bottle of pepper spray in his right hand. An empty gallon milk jug was located in the upstairs bathroom of Jones's residence.

{¶ 10} A week later, Jones was indicted on two counts of felony murder, two counts of felonious assault, one count of reckless homicide, and two counts of having weapons while under disability. Each felony murder and felonious assault charge included a three-year firearm specification. At the State's request and over defense counsel's objection, the trial court entered a nolle prosequi as to the reckless homicide charge. Prior to trial, Jones filed a notice of self-defense and waived his right to a jury trial on the weapons under disability counts.

{¶ 11} The matter proceeded to trial on November 12, 2024. At the beginning of the second day of trial, the prosecutor raised concerns about Jones's father being in or around the courtroom when Aaliyah and Toni testified based on a jail phone call the previous night between Jones, Aaliyah, and Jones's father. After an evidence technician testified, the court excluded Jones's father under the separation of witnesses order, finding that Jones's

father had become a potential witness in the case. Jones's father was permitted back in the courtroom on November 14, 2024.

{¶ 12} The State presented 13 witnesses and numerous exhibits. Jones testified on his own behalf, claiming that he had acted "angry in the heat of passion" and in self-defense. Defense counsel requested jury instructions on both voluntary manslaughter and self-defense. The trial court instructed the jury on self-defense but denied the request for a voluntary manslaughter instruction. The jury found Jones guilty of the felony murder and felonious assault charges and related specifications. The court found Jones guilty of both counts of having weapons while under disability.

{¶ 13} At sentencing, the trial court merged the felony murder and felonious assault counts and sentenced Jones to 15 years to life in prison for felony murder, plus an additional 6 years for two of the firearm specifications. The court imposed 36 months for each count of having weapons while under disability to be served concurrently. Jones's aggregate prison sentence was 21 years to life. The court ordered Jones to pay restitution of $19,050.73 and court costs and advised him of his duty to register as a violent offender upon his release from prison. Jones's timely appeal followed.

## II. Failure to Disprove Self-Defense

{¶ 14} We begin with Jones's fourth assignment of error, which claims that the State failed to disprove beyond a reasonable doubt that Jones acted in self-defense.

{¶ 15} Self-defense involving the use of deadly force requires the defendant to produce evidence that (1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that he or she was in danger of death or great bodily harm and that the only way to escape was the use of force, and (3) the defendant did not violate any duty to retreat. *State v. Barker*, 2022-Ohio-3756, ¶ 22 (2d Dist.); *State v.*

*Messenger*, 2022-Ohio-4562, ¶ 14. A claim of self-defense "requires evidence that the defendant had both an objectively reasonable belief and a subjective belief that force was necessary to protect himself or herself." *Barker* at ¶ 27. Additionally, a self-defense claim requires consideration of the force used relative to the danger. "If the force used was so disproportionate that it shows a purpose to injure, self-defense is unavailable." *Id*. at ¶ 28.

{¶ 16} A person no longer has a duty to retreat before using force in self-defense "if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B). Accordingly, the law has "remove[d], in most cases, the duty to retreat before using self-defense." *State v. Degahson*, 2022-Ohio-2972, ¶ 15 (2d Dist.).

{¶ 17} When a defendant presents evidence at trial tending to support that he or she used force in self-defense, the State must then prove beyond a reasonable doubt that the defendant did not act in self-defense. R.C. 2901.05(B)(1). To prevail, the State needs to disprove only one element of the self-defense claim. *State v. Knuff*, 2024-Ohio-902, ¶ 191.

{¶ 18} The Ohio Supreme Court has held that the State's self-defense burden is "subject to a manifest-weight review on appeal." *Messenger* at ¶ 27. *See also State v. Butler*, 2023-Ohio-3504, ¶ 17 (2d Dist.). "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.). *See Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19.

{¶ 19} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v.*

*Thompkins*, 78 Ohio St.3d 380, 387 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 20} Self-defense claims generally involve the issue of witness credibility, and disputes about the witnesses' credibility are best resolved by the trier of fact. *State v. Brogan*, 2024-Ohio-4601, ¶ 26 (2d Dist.), citing *State v. Campell*, 2024-Ohio-1693, ¶ 32 (8th Dist.). "When weighing witness testimony supporting a claim of self-defense, the trier of fact is 'free to believe or disbelieve the testimony of the witnesses' and 'is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.'" *State v. Lawrence*, 2023-Ohio-3419, ¶ 41 (11th Dist.), quoting *State v. Bentley*, 2023-Ohio-1792, ¶ 24 (11th Dist.).

{¶ 21} "Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2014-Ohio-3432, ¶ 24 (2d Dist.).

{¶ 22} Turning to the case before us, Jones testified that during the afternoon of August 10, 2023, he was drinking liquor and smoking marijuana with friends and became very intoxicated. While he was sleeping on the downstairs couch, he heard Aaliyah slam the

door and tell someone to "get the f*ck off my porch." Aaliyah stormed up the stairs, upset and irritated, and he went upstairs to calm her down. When Jones heard people arguing and cursing at each other outside, he came downstairs and saw Toni and the victim on the sidewalk in front of the house. Jones was upset that the victim "kept threatening us and threatening to kill the dog."

{¶ 23} According to Jones, he went outside, walked up to the victim and Toni, and told Toni to go back inside. Jones was wearing only shorts and had a gun in each pocket, but he denied having the guns out then. He told the jury that he asked the victim to leave several times, but the victim refused. The conversation "got heated" and they were "talking crazy to each other." While they were standing around the alley, the victim "buck[ed] up" at Jones, and Jones responded by slapping him. At that point, Aaliyah grabbed Jones's arm. Jones stated that he turned, and the victim started macing him. Jones clasped his eyes and fired in the victim's direction. Trial Tr. 798-800.

{¶ 24} Jones testified that he did not mean to kill the victim. Rather, he "was just trying to get him away from me because I didn't know if he had a knife. I didn't know what else he had. He took my eyesight with mace, so I didn't know what he was going to do." Trial Tr. 800. Jones described the victim as "acting crazy."

{¶ 25} During Jones's cross-examination, the prosecutor challenged Jones's assertion that the victim refused to leave and posed a threat, and he tested Jones's memory of the events. Jones asserted, among other things, that due to his intoxication, he could not tell that he was physically larger that the victim, nor did he see the victim's race, although they were "in each other's face." The prosecutor emphasized that Jones told the police multiple versions of what happened and asked Jones about his use of the phrase "sudden passion" in his testimony, a phrase not commonly used in the vernacular but with potential

legal significance in this case. Jones acknowledged that he made a conscious decision to shoot in the direction where the victim was standing. He said he did not know how many times he fired because he was drunk.

{¶ 26} The coroner testified that the victim's blood contained Delta-9 THC (the active component of marijuana), marijuana metabolites, and alcohol concentrations of .189 (from the heart) and .227 (from the eye). He could not say how those levels would have affected the victim.

{¶ 27} Six eyewitnesses—Toni; Aaliyah; two neighbors from across the street, Michael and Jamie; another neighbor who resided on Jones's street, Lynnette; and Chyna—testified for the State about the August 10, 2023 confrontations. From their testimony, the jury could have reasonably found beyond a reasonable doubt that Jones did not act in self-defense.

{¶ 28} The jury could have reasonably concluded that Jones was the initial aggressor and was at fault for creating the violent situation. Although the victim initiated the interaction with the occupants of Jones's residence by knocking on their door, the State's witnesses consistently testified that the victim did not begin the physical confrontation. Toni herself described her argument with the victim as somewhat one-sided. She indicated that she had yelled at the victim for about seven minutes, but he had not yelled back at her. From her porch, Jamie could see that the victim was talking back to Toni, but Jamie could not hear what he was saying. Jamie testified that, in contrast to the victim, Toni was stomping and shaking and "making a huge ruckus. You can hear her definitely plain as day." Michael similarly described Toni as "screaming at the top of her lungs." All witnesses indicated that the victim and Toni's interaction was verbal only. Toni denied that the victim had threatened her, hit her, threatened to mace her, or pointed a gun at her. She testified that she never felt

scared. In fact, she stated that, by the end, she and the victim "had a mutual." Most of the State's witnesses, including Michael and Jamie, testified that Jones exited the residence after the victim's interaction with Toni had ended.

{¶ 29} Jones himself acknowledged that he went outside carrying two guns, and most witnesses indicated that he was pointing them at the victim. According to the State's witnesses, the victim had raised his hands and was backing away when Jones escalated the encounter by hitting the victim. Michael and Jamie testified that Jones pistol-whipped the victim, knocking him to the ground. Most witnesses saw Jerry assault the victim, too. The victim's sunglasses, which he had been wearing, were found in the grass between the sidewalk in front of Jones's residence and the street. Instead of responding with force, the victim scooted or crawled away, ultimately standing in front of the residence across the alley from Jones's home. Jones continued the confrontation, holding his guns. Although the victim responded by spraying Jones in the eyes with pepper spray, the jury could have reasonably found that the victim did so to defend himself from Jones. And though Jones claimed that he fired his weapon to protect himself, the jury could have reasonably concluded that Jones had created the violent situation by threatening the victim with guns, assaulting the victim, and pursuing the victim towards the residence across the alley from Jones's home.

{¶ 30} The jury also could have reasonably concluded that Jones did not have an objectively reasonable belief that deadly force was required to protect himself. Jones testified that he felt he needed to shoot the victim when the victim "bucked up at me, I didn't know what he was going to do." Trial Tr. 799. When asked to clarify what he meant by the victim "bucking up at him," Jones stated that they "were in each other's faces." Trial Tr. 837. Jones acknowledged, however, that the victim never touched him with his fists and never pushed him. Jones never saw the victim with a knife or a gun. Trial Tr. 840. Jones further

admitted that he told the victim, "If you mace me, I'm going to shoot you." Given the State's evidence that the victim had been trying to retreat from Jones, that the victim did not fight back when Jones and Jerry assaulted him, that the victim never punched or shoved Jones, that the victim never displayed a deadly weapon, and that the victim wielded only pepper spray in defense, the jury could have reasonably concluded that Jones lacked an objectively reasonable belief that he needed to use deadly force to protect himself from the victim.

{¶ 31} We recognize that, through cross-examination, defense counsel elicited testimony from which the jury could have determined that some of the State's witnesses' testimony was not credible. Notably, several of the witnesses had given prior statements that were inconsistent with their testimony at trial. However, it was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State had proven beyond a reasonable doubt that Jones did not act in self-defense. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2021-Ohio-3947, ¶ 27 (2d Dist.). Upon review of the evidence, we cannot conclude that the jury lost its way when it found Jones guilty of murder and felonious assault, thus rejecting his claim of self-defense.

{¶ 32} Jones's fourth assignment of error is overruled.

### III. Dismissal of Reckless Homicide Charge

{¶ 33} In his first assignment of error, Jones claims that the trial court abused its discretion by granting the State's motion to dismiss the reckless homicide charge. He argues that the nolle prosequi was not entered in open court, contrary to the Crim.R. 48(A) and R.C. 2941.33, and that no good cause for the dismissal existed. Jones states that he was prejudiced by the trial court's decision because the jury might have convicted him of reckless homicide, a third-degree felony, as opposed to felony murder, which carries a life sentence.

{¶ 34} Crim.R. 48(A) permits the State to "seek dismissal of an indictment by leave of court and in open court." *State ex rel. Steele v. McClelland*, 2018-Ohio-4011, ¶ 8. R.C. 2941.33 prohibits a prosecutor from entering a nolle prosequi "in any cause without leave of the court, on good cause shown, in open court." A nolle prosequi that is entered contrary to the terms of R.C. 2941.33 is invalid. *Id*. "[T]he question that the court must consider when the state requests leave to file an entry of dismissal is whether the prosecutor has abused the prosecutorial discretion afforded him [or her] or whether the dismissal is clearly contrary to the public interest." *State v. Hammond*, 2015-Ohio-4156, ¶ 17 (5th Dist.).

{¶ 35} We have held that a criminal defendant typically cannot appeal the dismissal or nolle prosequi of charges without prejudice. *State v. Morgan*, 2012-Ohio-4750, ¶ 9 (2d Dist.), citing *Hudson v. Harger*, 2012-Ohio-2604, ¶ 3-8 (9th Dist.); *see State v. Robinson*, 2025-Ohio-2026, ¶ 16 (2d Dist.). This is so because the defendant is placed in the same position he or she was in prior to the filing of the charges. *Id*. However, this rationale appears to assume an appeal from the dismissal of all charges, not just individual counts.

{¶ 36} Where some, but not all, charges have been dismissed by the trial court at the request of the State, it is appropriate for a defendant to challenge the dismissal of the charges in the direct appeal from his or her conviction on one or more of the remaining charges. *Robinson* at ¶ 21. In such a case, we review the trial court's dismissal order for an abuse of discretion. *State v. Ramos*, 2022-Ohio-886, ¶ 35 (3d Dist.).

{¶ 37} In this case, the parties and the court discussed the potential dismissal of the reckless homicide charge on several occasions. At the final pretrial conference on July 30, 2024, which was held in open court, defense counsel mentioned the State's intention to file a motion to dismiss the reckless homicide count and his own intention to respond, depending on the content of the State's motion. The prosecutor replied that he was planning to write

simply that the State was dismissing the count, without too much legal precedent. The parties agree that a written motion was filed, but the document is not in the record.

{¶ 38} Another pretrial conference was held in open court on October 29, 2024. At that time, the trial court told the parties that it had not ruled on the State's motion to dismiss the reckless homicide charge because defense counsel had expressed an intent to file an opposition memorandum but had not done so. Defense counsel asked for an extension until the end of the week to file the response. Jones's opposition memorandum was filed on November 2, 2024.

{¶ 39} Six days later, the trial court granted the State's motion, using what appears to be an order provided by the State. It read, "At the request of the Prosecuting Attorney and for good cause shown, a **nolle prosequi** WITHOUT prejudice is entered herein by ORDER of the Court on **July 31, 2024 TO COUNT 5: RECKLESS HOMICIDE (F3) OF THE INDICTMENT DATED AUGUST 17, 202[3] ONLY**." (Emphasis in original.) We infer from the language of the order that the State's motion may have been filed on July 31, 2024.

{¶ 40} On the first day of trial, while on the record but without the jury present, defense counsel renewed his objection to the dismissal of the reckless homicide charge. The court responded that its "position on that was that the State couldn't find any authority that would prohibit the State from dismissing that count. However, I stated if the Defendant believes that the evidence reflects such a charge that that could be argued as a jury instruction potentially." Trial Tr. 224. The prosecutor interjected that he had emailed Ohio Supreme Court case law demonstrating that reckless homicide was not a lesser included offense of murder. The prosecutor indicated that the State would object to any reckless homicide instruction at trial.

{¶ 41} On this record, we find no error in the trial court's entry of the nolle prosequi on the reckless homicide charge. Though the motion itself was not made in open court, both parties recognized in open court that the motion was forthcoming and then filed, and the trial court indicated its receipt of the State's request and the dismissal of the charge in open court. The dismissal satisfied Crim.R. 48(A)'s and R.C. 2941.33's requirements that the prosecutor seek dismissal by leave of court and in open court.

{¶ 42} Because the State's motion to dismiss was not included in the record, the State's reasons for its request are not before us. Nevertheless, the State generally has broad discretion in determining which charges to pursue, and it is not unreasonable for the State to minimize the potential of confusion by the jury by reducing the charges at trial to a single theory of the case. In addition, by proceeding on a theory of self-defense, Jones was admitting that he had knowingly killed the victim; he could not reasonably argue that his conduct was due to recklessness. The trial court found good cause for the dismissal of the reckless homicide charge, and nothing in the record shows its absence.

{¶ 43} Jones claims that he was prejudiced by the dismissal because it removed the option of reckless homicide, a lesser-degree felony, as an alternative for the jury. However, reckless homicide is not a lesser-included offense of felony murder as a proximate result of felonious assault. It is possible for a person to commit felony murder without necessarily committing reckless homicide. *State v. Owens*, 2020-Ohio-4616. Jones, therefore, was not entitled to have reckless homicide presented to the jury.

{¶ 44} Moreover, because each count of an indictment charges a complete offense and the distinct counts are not interdependent, the jury was required to consider whether the State had proven each offense on its own merits. *See State v. Wallen*, 2005-Ohio-5576, ¶ 13 (2d Dist.). The inclusion of the reckless homicide charge at trial would not have removed

the jury's obligation to separately determine whether the State had met its burden on the felony murder and felonious assault charges. And, given the jury's guilty verdicts on the felony murder and felonious assault counts, we fail to see how Jones was prejudiced by the absence of the reckless homicide instruction.

{¶ 45} Jones's first assignment of error is overruled.

## IV. Denial of Right to Public Trial

{¶ 46} In his second assignment of error, Jones asserts that the exclusion of his father from the courtroom on the second day of trial denied him the right to a public trial.

{¶ 47} The Sixth Amendment guarantees the right to a public trial. *Waller v. Georgia*, 467 U.S. 39, 46 (1984*); In re Disqualification of Wollscheid*, 2024-Ohio-6176, ¶ 63. Similarly, the Ohio Constitution provides that "[a]ll courts shall be open." Ohio Const., art. I, § 16. As stated by the United States Supreme Court:

> The right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process — an essential component in our structure of self-government.

(Footnotes omitted.) *Globe Newspaper Co. v. Superior Court for Norfolk Cty*., 457 U.S. 596, 606 (1982). The violation of the right to a public trial constitutes structural error and is not subject to harmless-error analysis. *State v. Garrett*, 2022-Ohio-4218, ¶ 47.

{¶ 48} The right to a public trial is not absolute, however, and in some instances must yield to other interests, such as those essential to the administration of justice. *State v. Drummond*, 2006-Ohio-5084, ¶ 51. Though a trial judge has the authority and discretion to exercise control over court proceedings, "the abridgement of a defendant's right to a public trial may occur only when necessary, and any closure must be narrowly drawn and applied sparingly." *Id*.

{¶ 49} The Ohio Supreme Court has applied a four-pronged test to determine whether the closure of a courtroom is necessary: (1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, (2) the closure must be no broader than necessary to protect that interest, (3) the trial court must consider reasonable alternatives to closing the proceeding, and (4) it must make findings adequate to support the closure. *Drummond* at ¶ 52-60 (applying the test set forth in *Waller*). Where only the partial closure of the courtroom is involved, the trial court must have a "substantial reason" for the closure. *Id*. at ¶ 53; *Garrett* at ¶ 51.

{¶ 50} In this case, the State's concern about Jones's father's attendance arose out of a recorded jail phone call between Jones, Aaliyah, and Jones's father on the night before Aaliyah's testimony. At the beginning of the second day of trial, the prosecutor told the court that Jones had a three-way phone call with Aaliyah and his father where Jones told Aaliyah that his father was going to talk to her about what she needed to testify to. Trial Tr. 321. Detective David Posma, the State's representative, elaborated that during the prior evening, Jones had several phone conversations with his father. During one conversation, Jones asked his father if he had spoken to Aaliyah. After Aaliyah was added to the phone call, Aaliyah began to tell Jones what she and Jones's father had discussed. Jones cut her off and told her that was between the two of them. The State did not know what Jones's father

had said to Aaliyah, but based on the timing of the conversation, the prosecutor expressed concern about Jones's father watching Aaliyah and Toni testify. He explained that the father "could be a witness, at this point, based on however this testimony plays out." Trial Tr. 324.

{¶ 51} Concluding that Jones's father may have made himself a potential witness in the case, the trial court ordered the father's exclusion from the courtroom under the existing separation of witnesses order, over defense counsel's objection. The court stated that it took witness intimidation and tampering with witnesses very seriously. Later, defense counsel told the court that Jones's father was willing to testify to the court about the nature of his conversation with Aaliyah. The court denied the request, indicating that Jones would then become a witness, and reaffirmed its order.

{¶ 52} We find no error, much less structural error, from the exclusion of Jones's father from the courtroom during a portion of the second day of trial. The order at issue concerned a single spectator of Jones's trial, and the court required his exclusion from the courtroom based on a reasonable finding that he might later be called as a witness. To be sure, a trial court can exclude potential witnesses from the courtroom to ensure the integrity of their testimony. *See* Evid.R. 615. Jones's father was excluded only during the testimony of the State's eyewitnesses, all of which occurred on the second day of trial, and he was permitted back into the courtroom on the third day of trial for the State's law enforcement and expert witnesses. The exclusion of Jones's father was narrowly tailored to address the State's reasonable concerns occasioned by his contact with Aaliyah, one of the State's witnesses, on the evening of the first day of trial. Jones was not deprived of the protections of a public trial, in any sense, by the limited exclusion of his father from the courtroom during the eyewitnesses' testimony.

{¶ 53} Jones's second assignment of error is overruled.

## V. Admission of Witness's Prior Consistent Statements

**{¶ 54}** Jones's third assignment of error claims that the trial court misapplied Evid.R. 801(D)(1) by allowing the State to admit the prior consistent statements of its witness Chyna. Jones asserts that the trial court should not have permitted the State to play Chyna's recorded statement during its redirect examination of her.

**{¶ 55}** Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." In general, hearsay is not admissible. Evid.R. 802.

**{¶ 56}** Certain statements are excluded from the definition of hearsay, including prior statements by a witness, if they meet specific criteria. Evid.R. 801(D)(1). A declarant's prior consistent statement is not hearsay if (1) the declarant testifies at trial and is subject to examination concerning the statement, and (2) the statement is "consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive." Evid.R. 801(D)(1)(b).

**{¶ 57}** During her direct examination, Chyna testified that she was in Toni's bedroom with Toni, Jerry, and Aaliyah when the victim came to the front door. Aaliyah answered the door, came back, and told the group what was said. Toni got upset and went outside with her dog. At that point, Chyna went into the living room where Jones was sleeping on the couch. The commotion woke Jones, and he and Jerry went outside. Chyna knew Jones had guns in his pockets, but he did not have them out.

**{¶ 58}** Chyna also exited the house, stopping on the porch. Once outside, Chyna saw Jones and Jerry standing with the victim near the alley, telling him to leave. According to Chyna, Jones hit the victim once in the face with his hand, and Jerry hit him twice, causing the victim to fall to the ground. After the victim got back on his feet, Jones repeatedly told

the victim to leave, but he would not. Chyna testified that, with guns pointed at him, the victim "did something" after which Jones fired five shots directly in front of him, striking the victim. Jones told Chyna that the victim had pepper-sprayed him, but she did not witness that happen. Chyna did not see the victim with a gun and did not see the victim hit Jones or Jerry.

{¶ 59} After the shooting, Chyna went to the home next to Jones's residence. When she left the house, the police placed her in a cruiser and she had recorded conversations with detectives. Chyna stated that she was not honest during the first and second conversations, "[b]ut the third time he came and talked to me, yes, I was honest." Trial Tr. 613. She elaborated that, in her first account, she had said she did not know who the shooter was. She did not recall saying that the victim had shot first. Chyna testified that after being told that she could get in trouble and go to jail, she told the truth and said that Jones was the shooter. She admitted that she had a pending criminal charge but said that she was not promised anything in exchange for her testimony.

{¶ 60} On cross-examination, defense counsel asked Chyna if "the reason you've added facts to what you've said and changed your story is because you want to hopefully curry favor with the Prosecutor's Office for them to be lenient on you in that pending criminal investigation?" Chyna responded, "No," and reiterated that she had not been offered any deals for favorable testimony. Upon additional questioning, Chyna confirmed that she had told the police that the victim kept coming to the house, harassing them. However, she either denied or indicated that she did not recall making other statements to a detective, including a statement that the victim had fired first. Defense counsel played a portion of the recorded conversation to refresh her recollection. The recording is not part of the record, and it is not clear how much of it was played. Defense counsel then continued questioning Chyna about additional inconsistencies between her testimony and her prior statements to the police,

such as how far Jones was standing from the victim when the shooting occurred and how many guns she saw Jones holding. Chyna acknowledged that she had lied to help a friend and had given three different statements.

{¶ 61} On redirect examination, the prosecutor reaffirmed with Chyna that she had ultimately told the police on August 10, 2023 that Jones was the shooter and that he had two guns. Over defense counsel's objection, the prosecutor then played the recording of those statements. Afterward, Chyna again agreed that, on the day of the shooting, she had said that Jones had raised both guns and then fired the black gun.

{¶ 62} On appeal, Jones claims that it was improper for the trial court to allow the State to rehabilitate Chyna with her prior consistent statement because it was made after the inconsistent statements with which she was impeached. We disagree. Defense counsel raised on cross-examination whether Chyna had changed her story or embellished it due to a pending criminal charge. Defense counsel also cross-examined her about her testimony, focusing on her prior inconsistent statements. After the defense raised the specter of recent fabrication or an improper motive for Chyna's testimony, the State was entitled to offer Chyna's prior consistent statements to rebut that implication. It is irrelevant that Chyna's prior consistent statement was her third version of events given on August 10, 2023, not her first. Accordingly, the trial court did not err in allowing the State to play the portion of Chyna's recorded statement to show that her testimony was consistent with what she had previously told the Dayton police.

{¶ 63} Even if the trial court should have prohibited the State from playing Chyna's prior consistent statement, any error is harmless beyond a reasonable doubt. Jones himself testified that he had both guns and that he shot the victim.

{¶ 64} Jones's third assignment of error is overruled.

## VI. Voluntary Manslaughter Instruction

{¶ 65} Jones's fifth assignment of error claims that the trial court's failure to instruct the jury on voluntary manslaughter violated his right to due process and a fair trial.

{¶ 66} The voluntary manslaughter statute provides that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another. . . ." R.C. 2903.03(A); *State v. Bonaparte*, 2019-Ohio-2030, ¶ 69 (2d Dist.).

{¶ 67} In determining if a serious provocation was reasonably sufficient to bring about a sudden fit of rage or passion, courts apply a two-part test. *State v. Boyer*, 2025-Ohio-2627, ¶ 61 (7th Dist.); *State v. Shane*, 63 Ohio St.3d 630, 634 (1992). First, courts must use an objective standard to determine whether the alleged provocation was reasonably sufficient to bring on a sudden passion or fit of rage. *Shane* at 634. If this objective standard is met, the inquiry shifts to a subjective standard to determine whether the defendant actually was under the influence of sudden passion or in a sudden fit of rage. *Id*.; *State v. Murray*, 2025-Ohio-1485, ¶ 41 (2d Dist.). The provocation must be reasonably sufficient to incite the defendant to use deadly force. "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Shane*, 63 Ohio St.3d at 635. "In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him [or her] at the time." *State v. Deem*, 40 Ohio St.3d 205 (1988), paragraph five of the syllabus; *State v. Mack*, 82 Ohio St.3d 198, 200 (1998).

{¶ 68} Unlike purposeful murder under R.C. 2903.02(A), voluntary manslaughter "includes the mitigating element of serious provocation by the victim reasonably sufficient to incite the defendant into using deadly force." *State v. Bonaparte*, 2019-Ohio-2030, ¶ 69 (2d Dist.), citing *State v. Thomas*, 2003-Ohio-42, ¶ 17 (2d Dist.). Accordingly, it is well established that voluntary manslaughter is an inferior-degree offense to purposeful murder. *See Shane* at 632 (addressing murder under former R.C. 2903.02, which then included only purposeful murder).

{¶ 69} We recently commented that a growing number of courts have recognized that voluntary manslaughter is not an inferior-degree offense to felony murder as a proximate result of felonious assault. *State v. Gillilan*, 2024-Ohio-4603, ¶ 43 (2d Dist.), quoting *State v. Dixon*, 2022-Ohio-4454, ¶ 28, fn. 1 (4th Dist.).

{¶ 70} Even if voluntary manslaughter were an inferior-degree offense to felony murder, a jury instruction on voluntary manslaughter would have been appropriate only if there were sufficient evidence to allow a jury to reasonably reject the greater felony murder offense and to find a defendant guilty on the lesser offense of voluntary manslaughter. *Gillilan* at ¶ 44. When the evidence meets this test, a trial court must instruct the jury on voluntary manslaughter. *Id*.

{¶ 71} "This court has recognized that a self-defense argument generally is inconsistent with a serious-provocation theory." *State v. Newby*, 2024-Ohio-1391, ¶ 72, quoting *State v. Dixon*, 2022-Ohio-3157, ¶ 22 (2d Dist.). Consequently, self-defense and voluntary manslaughter instructions are generally incompatible. However, we have recognized that "the two theories conceivably might be compatible where a defendant is found to have exceeded the degree of force necessary to defend himself because he acted out of passion or rage." *Id*.

{¶ 72} We review a trial court's refusal to instruct a jury on voluntary manslaughter for an abuse of discretion.

{¶ 73} Jones asserted a claim of self-defense and also requested a voluntary manslaughter instruction. To support both instructions, Jones testified that he was fearful after the victim sprayed him in the face with pepper spray, which temporarily blinded him, and that he also acted "angry in the heat of passion. I was provoked." Trial Tr. 800. Jones said that he fired multiple shots at the victim because the victim was "acting crazy" and Jones did not know what the victim was going to do.

{¶ 74} Even accepting that Jones became enraged by the victim, there was no evidence that the victim engaged in conduct that was reasonably sufficient to incite Jones into using deadly force. Jones first stated that he was angry that the victim had threatened to kill Savage. But the victim had not threatened to kill the dog imminently and had not engaged in threatening behavior toward Toni, Savage, or anyone else before becoming involved with Jones. Jones next stated that the victim "bucked up against him." Yet Jones acknowledged that the victim did not touch him. "Words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *Shane*, 63 Ohio St.3d 630, at paragraph two of the syllabus; *State v. Mack*, 82 Ohio St.3d 198, 201 (1998). And though Jones subjectively believed that the victim would not leave, the victim was standing in front of the home across the alley from Jones's residence when the shooting occurred. By all accounts, the victim was retreating, even if he had also "bucked up."

{¶ 75} Finally, Jones testified that he fired on the victim after being sprayed with pepper spray. As the coroner testified, pepper spray is "something that can be deployed in a situation where you're worried about your own self-defense." Although pepper spray causes irritation to the eyes and does not feel good, as Detective Posma explained, it leaves

no lasting damage; the detective knew of no situation where someone had died from pepper spray alone. Jones testified that his vision was obstructed for about 20 minutes; he did not request medical attention and was not taken to the hospital after his interview at the police station.

{¶ 76} Even assuming that being sprayed with pepper spray was enough to provoke a violent response, it was not sufficient provocation for a deadly response, particularly in this case. The victim deployed his pepper spray only after being assaulted by both Jones and Jerry and after he had retreated to the front of the residence across the alley from Jones's home. Jones was not taken by surprise by the pepper spray. He testified that he told the victim that he would shoot if the victim sprayed him, although Jones said that this threat was meant "like a warning threat. I never meant to do anything to this guy."

{¶ 77} The evidence at trial, even when construed in Jones's favor, did not support a finding that Jones acted under the influence of sudden passion or a sudden fit of rage brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the use of deadly force. No reasonable jury could have found Jones not guilty of murder but guilty of voluntary manslaughter. The trial court did not abuse its discretion when it refused to instruct the jury on voluntary manslaughter. Accordingly, we overrule Jones's fifth assignment of error.

### VII. Cumulative Error

{¶ 78} Jones's sixth assignment of error contends that the trial court committed multiple errors and that the cumulative effect of those errors denied him a fair trial.

{¶ 79} Under the doctrine of cumulative error, "[s]eparately harmless errors may violate a defendant's right to a fair trial when the errors are considered together." *State v. Harris*, 2004-Ohio-3570, ¶ 40 (2d Dist.). To even consider whether cumulative error is

present, we first must find that multiple errors were committed at trial. *State v. Mize*, 2022-Ohio-3163, ¶ 76 (2d Dist.), citing *State v. Madrigal*, 87 Ohio St.3d 378, 398 (2000). "A conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 2012-Ohio-2577, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. The doctrine is inapplicable unless there are "multiple instances of harmless error." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995).

**{¶ 80}** Having found no errors in the record before us, we cannot find cumulative error. Accordingly, the sixth assignment of error is overruled.

## VIII. Conclusion

**{¶ 81}** The trial court's judgment is affirmed.

. . . . . . . . . . . . .

HUFFMAN, J., and HANSEMAN, J., concur.